[Crim. No. 2544.   First Dist., Div. One.   Nov. 16, 1949.]

THE PEOPLE, Respondent, v. PAUL S. COHN, Appellant.

Leo R. Friedman for Appellant.

Fred N. Howser, Attorney General, Clarence A. Linn and B. Abbott Goldberg, Deputy Attorneys General, for Respondent.

BRAY, J.—Appeal by defendant Paul Cohn from a judgment of conviction of violation of section 337a, subdivision 2, of the Penal Code after jury verdict finding defendant guilty as charged in count one of the amended information, and from the order denying a new trial. The jury failed to reach a verdict as to defendant on counts two and three charging violations of section 337a, subdivision 4, and of conspiracy to violate these sections. The jury also failed to reach a verdict as to Cohn's codefendant Frank Low on any count of the information. Defendant's motion for new trial was denied and he was sentenced to San Quentin for the term prescribed by law.

Section 337a, subdivision 2, Penal Code, under which defendant was convicted, makes it a crime for any person to keep or occupy at any time whatever any premises with betting paraphernalia for the purpose of recording bets, purported bets, wagers or pools on horse racing. The section applies to any person doing any of the prohibited acts in a

single instance as well as to one doing such acts as a business or occupation.

The main attack is on the claimed insufficiency of the evidence to support the verdict, and alleged error of the court in failing to instruct properly concerning the limited effect of certain evidence.

Defendant, doing business as the Bouquet Cohn Cigar Company, was proprietor of the Bonanza Café, 141 Montgomery Street, San Francisco, and of 13 cigar stores in San Francisco for which he had obtained licenses to operate pinball machines and off-sale liquor licenses, and on which he paid personal property taxes. It was the theory of the State that defendant was using the premises at 141-145 Montgomery Street as a central clearing house for bets made at the various cigar stores operated by him.

The Steil Building, in which the events leading to defendant's arrest transpired, is a four-story building facing Montgomery Street and bounded on the rear by Trinity Place. The Bonanza Café occupied the first floor; a suite of offices and a storeroom the second floor; a tailoring establishment the third; and a photostating business and reweaving service the fourth. The floors were connected by elevators and stairways. The State contended that the bookmaking activities took place in a suite of three small offices on the second floor near the rear of the building. There was also a large front office which was being renovated, and a storeroom containing supplies and beverages. This storeroom was admittedly used in connection with the tavern operated on the ground floor, and, Cohn contended, for no other purpose. In one of the small offices on this floor was a large table with three telephones, a wooden rack divided into partitions, each containing a pad of paper, and a smaller table with one telephone, wastebasket and two chairs.

On August 28, 1947, Special Investigator Hoy of the attorney general's office and Sergeant Hanlon of the San Francisco Police Department visited the premises and went to the second floor by elevator where they encountered Cohn. They introduced themselves and told him they had information that bookmaking was being carried on there. Cohn replied, "You don't see anything, do you?" The officers observed the three telephones on the large table and a fourth on a smaller table which was connected to a terminal box in the storeroom, also a fifth telephone located in another of the smaller offices and

connected to one of the three telephones on the large table. Agent Hoy asked defendant if the telephones were his and he replied that they belonged to "Frank Peters" who was said to be in the advertising business but whose whereabouts defendant did not know. No bookmaking paraphernalia was observed on this visit. As the parties walked through the large front office Agent Hoy made the remark, "I guess this is probably where your one hundred dollar bettors may be—will be sitting around." The defendant laughed and replied, "There is more money in 'Acey-Deucey' bettors." On cross-examination Hoy testified that "Acey-Deucey" is a game played with dice.

On August 29, 1947, Hoy, Hanlon and Officer Keane of the San Francisco Police Department visited the premises. They found three telephones in the small office ringing busily. Officer Keane attempted to go up the stairway but found the second floor door locked. However, defendant came up the stairway, unlocked the door and went in with the officer. Hoy was answering telephones. A voice on one call said, "This is 15." When he said "O. K. Go ahead," the telephone was hung up. Another call began, "This is 6." When Hoy replied the party hung up. There were other similar calls. Hoy estimated that he answered 25 or 30 calls. The telephones rang continuously and sometimes all three rang simultaneously. "As fast as you could pick one [up] the other would be ringing. You couldn't answer them all at one time." Sergeant Hanlon and Officer Keane had similar experiences. One party asked for Paul. Defendant took the call and the conversation consisted of "yes" and "no." There was a long distance call for defendant on the telephone on the smaller table. Defendant took the call and there was a conversation in which he told the party on the other end of the line that "This place here is wired for sound." When he finished the telephone conversation he stated that the call was from "Del Mar," that he had a couple of horses running there. At one time at the request of Sergeant Hanlon, the defendant took a call on one of the telephones on the larger table, said "hello" three or four times and then made a remark to the effect that "You have got them so scared they don't even recognize their master's voice." The telephones kept ringing for about 20 minutes, becoming less frequent and finally ceasing. Hoy and Keane saw pads piled on the table but no writing other than the numbers at the bottom ranging from 1 to 16. They saw no papers relating to "Frank Peters" or to any advertising busi-

ness, and no "Frank Peters" ever appeared in these proceedings. The officers paid a third visit on the afternoon of August 29, when they found the elevator padlocked. They contacted defendant who unlocked the stair door. There was no activity nor were any papers visible.

On the morning of September 5, 1947, Hoy and Officers Overstreet, Talbot and Duggins of the San Francisco Police Department visited the premises. Hoy and Overstreet entered the second floor, through a window by means of a ladder, while Talbot went through the Bonanza Café to the stairway at the rear. As Hoy and Overstreet entered they heard a buzzer, scuffling of feet and a voice saying, "It is the cops. It is the cops." Talbot heard the sound of persons running. As Overstreet was entering he saw two men running; when he got in the men were gone. He unlocked the stairway door between the first and second floors and admitted Officer Talbot and Officer Duggins who was followed by defendant. On the third floor in the tailor shop, Giffen was found sitting on a sofa and Low was having a coat fitted which did not match his trousers, which was obviously too small for him, and on which the sleeves were 3 inches too short. Overstreet identified these men as the two he had seen running. Overstreet testified that when he saw the man he identified as Low running through the offices, Low wore a dark blue suit, while Hoy described it as dark brown. Low said that he was a clerk for Cohn. Low took off the coat and said to the tailor, "This is all right after you shorten the sleeves." (The next day Overstreet checked the tailor's book and found orders and measurements for suits for both Low and Giffen entered on September 5.) The men returned with the officers to the second floor. Hoy had found the receivers of three telephones off the hooks. When he replaced them they began to ring. The storeroom telephone listed to Cohn did not ring. Hoy answered one phone and a voice said, "This is Bill, and can I have 5 across on 428?" Then when the party asked for Roy or Frank and found they were out he hung up. Officer Overstreet had two similar conversations. He testified, "The man's voice said, 'This is Mission.' I said, 'O. K.' He said, '168, 3 to win. 174, 10 to win.' I repeated those numbers to him. I said, 'O. K.' and he hung up." Relating a later call, "The man's voice in answer to my 'Hello,' said, 'Is this Roy?' And I didn't say anything. He said, 'Is this Roy?' I said, 'Yes.' He said, 'What is the password?' I didn't say anything. I said, 'O. K. go ahead.'

He said, 'What is the password?' I said, 'Roy is downstairs for a moment.' 'Where is Frank?' I said, 'He went downstairs, also.' I said, 'They both left without telling me the password.' He said, 'Is it O. K.?' I said, 'If it wasn't O. K., I wouldn't be here.' He said, 'All right.' He said, 'Give me 5 to win on 184 field.' I said, 'O. K.' Repeated it to him. I said, 'O. K.' and he hung up." Giffen and Low refused to write their names for the officers following a warning nod of defendant.

Defendant met Agent Hoy in the hallway and the following conversation was detailed by the officer: "Mr. Cohn told me, he said, 'I want to make one more plea to you.' I told Cohn that it was all up to the Police Department from now on, that it was their case. Cohn said, 'Well, anyway, it is worth a nice package to you.' I said, 'What do you mean?' He said, 'If you let those two fellows go in there and forget the whole thing, it will be worth a nice package to you.' And he said, 'You name it.' " Hoy was asked: "And yet on three prior visits, Mr. Cohn on each time had told you there was nothing in the premises so far as bookmaking was concerned, is that right?" and he answered, "Yes. I think the language was 'You didn't see anything.' "

On the occasion of their visit on the morning of September 5, 1947, the officers found and seized in the three rear offices on the second floor of the Montgomery Street property the following paraphernalia: One large clock; Three telephones; One extension telephone and switch box; One telephone; One extension cord and bell; Slotted box containing 14 pads of paper which contained records of bets placed on horse races; Copies of the Daily Bulletin and Sports Review; Run-down sheets; 62 sheets of paper containing records of bets made on horse races; 1 sheet of paper, the same being the run-down sheet for September 5, 1947. The slotted box was divided into partitions numbered from 1 to 16.

The recital of this evidence is a refutation of defendant's claim that there was insufficient evidence to support the verdict. It was said in *People* v. *Abraham,* 67 Cal.App.2d 425, 427 [154 P.2d 450]: "A violation of section 337a, subdivision 2, is complete when it is shown that the accused occupied a place with papers and paraphernalia for the purpose of recording bets on horse races." Defendant's occupancy of the premises, the use of the telephones, and the presence of the racing sheets and betting paraphernalia all unite to complete the proof of violation of the statute. On this there is ample

authority. (*People* v. *Warnick,* 86 Cal.App.2d 900 [195 P.2d 552] ; *People* v. *Kelley,* 22 Cal.2d 169, 176 [137 P.2d 1] ; *People* v. *Vertlieb,* 22 Cal.2d 193, 196 [137 P.2d 437] ; *People* v. *Ines,* 90 Cal.App.2d 495 [203 P.2d 540].)

Defendant originally contended that the telephone conversations testified to by the officers were inadmissible. However, at the argument, defendant admitted that they were admissible for the limited purpose of proving, not the truth of what was said, but that the premises were being illegally used for taking bets on horse races. That this is the law in California is well established. (*People* v. *Kelley, supra*; *People* v. *Vertlieb, supra*; *People* v. *Klein,* 71 Cal.App.2d 588 [163 P.2d 71].)

Defendant insists that the court failed to instruct the jury properly concerning the limitations on this evidence. Early in the trial, witness Overstreet was asked to give the conversations he heard over the phone. Defendant objected on the ground that they were hearsay as to him. The court properly overruled the objection. Before the witness gave any of the conversations, defendant again objected. This time the court stated that they were admissible ''to show the occupancy and use'' of the premises for the purpose of betting. Defendant then objected that they were not admissible even for this purpose. He was overruled. Later witness Hoy was asked to relate the phone conversations he had heard. The defendant again objected and was overruled. Up to this point no request was made for an instruction to the jury. Defendant was in error as to his objection, and the court was correct in ruling that the conversations were admissible to show the use of the premises. Later, Officer Hanlon was asked concerning a telephone conversation. Again defendant objected to its admission, and when overruled, asked the court ''to limit this particular type of testimony to be given by this witness to the fact that it not be considered here as being truthful as to what was heard over the phones or as evidence against either the defendants and can only be used for the purpose of determining the use to which the premises were being made, and not as to who was using the premises.'' The court replied: ''No. I will not limit it. The instructions will cover that subject.''

Officer Keane was asked to state the conversation he heard on the phone. Again the defendant objected and was properly overruled. Defendant thereupon asked the court ''to make the same limitations on this testimony I have requested to be

made to other conversations about these telephone conversations." The court merely replied, "Overruled." Approximately 11 days elapsed from the date of this occurrence until the court instructed the jury. In his argument to the jury, the district attorney referred to the fact that in the telephone conversations the speakers identified themselves by certain numbers which corresponded to the numbers on the pads and slotted box and which he argued were the designation of the various stores owned by Cohn. He also pointed out that the reference in the conversations to "Roy" and "Frank" meant Roy Giffen and Frank Low.

Defendant offered a properly worded instruction to the effect that these telephone conversations were "admitted solely and exclusively for the purpose of establishing the character of the activities being carried on at said premises and for no other purposes" and could not be considered by the jury "as in any way tending to connect either of the defendants with the crimes charged . . . [nor] as being in any way binding upon either of the defendants" nor "as establishing the truth of anything that was said by the other party to the telephone conversation." Instead of giving this instruction, the court, after discussing evidence which was received against one of the defendants only, stated, "there were other certain telephone conversations admitted in evidence for the purpose of establishing the character of the activities being carried on on the premises at 145 Montgomery Street. All telephone conversations in this case are so limited and will be so considered by you."

As the evidence was admitted for a limited purpose only, the court, when requested by defendant so to do, should have instructed the jury immediately as to its limited effect. Likewise the court should have given the instruction requested by the defendant, rather than the more or less offhand instruction which it did give. Its instruction was correct as far as it went, but in view of the time which had elapsed since the evidence was heard, its failure to instruct at the time, and all of the circumstances of the case, it should have been more specific and detailed. (*People* v. *Cook,* 148 Cal. 334 [83 P. 43] ; *People* v. *Kane,* 27 Cal.2d 693 [166 P.2d 285].) But, having in mind section 4½ of article VI of the Constitution, there was no miscarriage of justice. There is abundant evidence that the premises were being used for the taking of bets and that defendant kept and occupied them for that purpose. The fact that defendant had access by a key which

opened the locked door from his liquor storeroom to the small room where the telephones and gambling paraphernalia were kept; the fact that the fourth telephone in that room led to a terminal box in defendant's storeroom which phone was listed in defendant's name; the fact that defendant received phone messages not only over this phone but also over the other phones listed in the name of ''Frank Peters''; defendant's statement ''you have got them so scared they don't even recognize their master's voice,'' and other statements made by him; the fact that although the three telephones are listed by the telephone company to ''Frank Peters'' there is no account in his name on the books of defendant's wife who is the owner of the building; the fact that the betting markers were in the handwriting of Low and Giffen, defendant's employees; the fact that the telephone bills for Peters were mailed to the same address as those addressed to Cohn; the fact that none of the tenants of the building ever saw Peters; the fact that found in the wastebasket in the little room was a card listing the phone numbers of the 13 stores owned by defendant and also such a card was found on the person of Giffen; the inferences that reasonably can be drawn from the failure of defendant to take the stand, and from the failure of the wife to testify concerning the tenancy of the room in question—these and other matters leave no possible doubt of the defendant's guilt.

In the absence of anything said over the phone there is sufficient evidence to justify the inference that the numbers on the slotted box were the numbers given to the various stores owned by defendant, and that the little room was the clearing house for bets coming from those stores. However, to convict defendant of the crime charged it was not necessary to prove that this was so. There was ample evidence that the room was occupied and used by defendant as a place to receive bets. That is all that is required to constitute the offense of which defendant was convicted. It is immaterial whether the bets came from stores of defendant or from some other source.

Defendant made no objection to the district attorney's reference in argument to the telephone conversations at the time, nor did he request the court to instruct the jury to disregard it. Hence he cannot raise the question now. (*People v. O'Moore*, 83 Cal.App.2d 586 [189 P.2d 554]; *People v. Horowitz*, 70 Cal.App.2d 675 [161 P.2d 833]; *People v. Dye*, 81 Cal.App.2d 952 [185 P.2d 624].)

*People* v. *Orcalles*, 32 Cal.2d 562 [197 P.2d 26], is not applicable to the facts of this case. There the district attorney referred to a prior statement of a witness introduced for impeachment of that witness, as proof of the facts contained in the statement. The defendant objected, but the court, instead of then, or at any other time, explaining to the jury the purpose of admitting the statement, merely said that the jury were "the ones who are to determine what evidence has been presented." (P. 569.) Later, the court refused to give an offered instruction on the subject. The court not only refused to limit the evidence, but in view of the language of other instructions, in effect instructed the jury that they might consider it for all purposes.

This case is easily distinguished from *People* v. *Cook, supra* (148 Cal. 334), and *People* v. *Kane, supra* (27 Cal.2d 693), so far as the effect of the failure of the court to instruct fully on the limited purpose of the phone conversations. Here, the portions of the phone conversations which were inadmissible against defendant did not appreciably add anything to the prosecution's case. In the Cook case, however, the evidence which it was sought to have the jury clearly understand was admitted for a limited purpose only, if not so applied by the jury, materially affected defendant's right to the plea of self-defense. In the Kane case, the court's instructions left the application of reasonable doubt to, and the distinction between, robbery and grand theft, "either wholly unexplained or derivable only from inference." (P. 699.)

■ Defendant complains of the admission of testimony relating to long distance calls over the phones listed both to defendant and "Frank Peters." The most that this testimony showed was that identical persons sent long distance calls over the telephone listed to defendant and over those listed to "Frank Peters." There was a reasonable inference that "Frank Peters" was a mythical person and that the telephones listed to him were really owned and used by defendant and his employees for the purpose of receiving bets. The fact that two of the phones had been moved from the Russ Building where for approximately a year they had been listed to "Frank Peters," that during that period the bills therefor were sent in his name to that building, and that the listing always showed "Frank Peters" as an advertising concern and that the evidence failed to show whether the request for moving was in writing, did not overcome this inference. The testimony was properly admitted.

Defendant complains of the admission of the testimony of an expert on bookmaking that certain pads and other paraphernalia seized at the premises represented materials used in making bets on horse racing. This point has been raised so frequently in these bookmaking cases, and so uniformly ruled adversely to defendants, that it is sufficient to cite *People* v. *Newman,* 24 Cal.2d 168, 174 [148 P.2d 4, 152 A.L.R. 365], where approval was given to *People* v. *Hinkle,* 64 Cal.App. 375, 378 [221 P. 693].

Defendant objected to the introduction of certain exhibits which were seized at the time of the arrest. Generally these exhibits were cards, sheets of paper, or pads showing bets made on horse races or results of races run. Many were shown to have been made by defendant's employees. The fact that one of these cards was torn and in a wastebasket, and that none of the evidence was found on defendant's person, does not change the situation any. All were in his "possession" at the time of the raid. There was no error here. (*People* v. *Davis,* 65 Cal.App.2d 255 [150 P.2d 474].) Nor was there any error in admitting the cards found in Giffen's wallet after his arrest. He had been tied in to Cohn both because of his presence at the premises and because, admittedly, he was an employee.

Defendant assigns as misconduct the statement of the district attorney: "You know your District Attorney has the power and does screen all the felony cases and he decides whether there is sufficient evidence to bring the case to trial or not. If there is not sufficient evidence the case never comes to court." Defendant assigned the statement as misconduct and asked the court to instruct the jury. Immediately the court instructed the jury to disregard it. This cured any error there may have been in making the statement.

Misconduct is also assigned in the reference to the failure of the defendants to produce the witness "Frank Peters" and the inability of the very capable police department and staff of the district attorney's office to uncover him. The district attorney may have been overzealous in his praise, but his reference to the failure of the defense to produce the witness was unobjectionable. The evidence showed that the building was owned by defendant's wife, that her books failed to show a lease to "Frank Peters," that his name appeared only on the listed telephones which were used by defendant

and his employees. If such a person as "Frank Peters" existed defendant could either have produced him or shown that he was unable to do so. As the case stood at the time the statement of the district attorney was made the jury could reasonably have inferred that "Frank Peters" was a myth. The statement of the district attorney under the circumstances could not have been prejudicial. "It is undoubtedly the rule that the district attorney may comment upon the failure of the defendant to produce material witnesses who would substantiate his story." (*People* v. *Fitzgerald*, 14 Cal.App.2d 180, 205 [58 P.2d 718].) Particularly is this so where as here the evidence shows that defendant and his wife must have known "Frank Peters," if he existed, fairly well, and defendant made no effort to account for his nonappearance.

Finally it is argued that the trial court erred when it asked the jury how it stood numerically and when told "11-1" on one count, and again, "On one we have twelve" instructed the jury to return for further deliberation. The jury then returned with a verdict of guilty as to Cohn on the first count, and failed to reach a verdict as to him on the second and third counts. It also failed to reach a verdict as to Low on any of the counts. Whether an earlier failure to agree concerned both defendants or Low alone does not appear because there is uncertainty in the numbers used by the forewoman—whether she referred to the parties or to the three counts of the information. All parties were apparently content to risk a chance on the further deliberations of the jury and no objection was made to the procedure. The defendant now argues that this was coercive. The point is not well taken. (*People* v. *Curtis*, 36 Cal.App.2d 306, 325 [98 P.2d 228] and cases cited.) (See, also, *People* v. *Walker*, 93 Cal.App.2d 818, at p. 822 [209 P.2d 834].)

The judgment and order are affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied December 1, 1949, and appellant's petition for a hearing by the Supreme Court was denied December 15, 1949.