[Crim. No. 9012. Second Dist., Div. One. June 19, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. KARL FREY, Defendant and Appellant.

Morris Lavine for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

KINCAID, J. pro tem.*—By information filed, appellant Karl Frey and certain codefendants were charged with pimping and pandering and conspiring to commit these offenses.

The first count (conspiracy, in violation of Pen. Code, § 182) charges appellant Frey, Robert Kittridge, Jr., hereinafter called "Kittridge," and Jack Phillips, hereinafter called "Phillips," with conspiring and agreeing together, and with other persons, to commit the crimes of pimping and pandering. Six overt acts are charged in furtherance of the

*Retired judge of the superior court sitting pro tempore under assignment by the Chairman of the Judicial Council.

conspiracy which is alleged to have continued during the period between the latter part of 1959 and December 2, 1961.

Count 2 charges appellant and Kittridge with pimping, in violation of section 266h of the Penal Code, and involving one Anita Hodge Wong, hereinafter called "Anita."

Count 3 charges appellant and Kittridge with pandering, in violation of section 266i of the Penal Code, and likewise involving Anita.

Count 4 charges Frey, Kittridge and Phillips with pandering and involving one Shirley Doupnik, hereinafter called "Shirley."

Count 5 charges these same three defendants with pandering involving Shirley.

The six overt acts referred to name the defendants and Anita, Shirley, and Sheila Taylor (also known as Vicki Taylor), hereinafter called "Sheila."

The information was dismissed as against defendant Phillips, under section 1324 of the Penal Code, prior to the trial, and he became a witness for the People. Kittridge ultimately entered a plea of guilty, and the trial proceeded against appellant only.

Appellant was found guilty of the offenses charged in all five counts. Proceedings were thereafter ordered suspended and probation was granted for the period of five years upon condition that appellant serve the first 270 days in the county jail, pay a fine of $10,000, and have no further connection with places known for prostitution activities.

Appellant's motion for a new trial was denied. His appeal is from the judgment of conviction of the crimes charged in the five counts and from the order of the court granting his application for probation. Although there is actually no final judgment of conviction herein, section 1237, subdivision 1, of the Penal Code provides that an order granting probation is deemed to be a final judgment for the purpose of appeal and we so consider it.

Among other assignments of error, appellant contends that the evidence as to each count is insufficient to sustain the verdict and the judgment; that the judgment as to each count is contrary to the evidence and to the law.

### STATEMENT OF FACTS

The evidence as to counts 2 and 3 concerns the charged offenses of pimping and pandering as having occurred during the interval between September 28, and October 2, 1961, and involving the female person Anita.

Appellant was an owner-manager of and lived at a 175-room hotel located on a prominent street in Los Angeles. Anita testified, in effect, that in September 1961 she was visited by her friend Sheila who told her that appellant owned the said hotel and if Anita would go to work there as a prostitute appellant would arrange dates for prostitution, provide her with an apartment, and also would provide her with proceeds from her prostitution. In addition, Sheila promised to procure customers for Anita to increase her earnings. Sheila would take 40 per cent, and Anita would retain 60 per cent of such earnings. Sheila said she had made arrangements for Anita to meet the appellant at the hotel.

On the evening of September 28, Sheila took Anita to the hotel and there introduced her to the appellant, who said Anita was nice looking. Appellant then suggested that they look at apartments for Anita, and apartment 116 was pointed out to her as particularly suitable, inasmuch as it had three doors that would have to be broken down in event of a raid, and a window was near the ground level. Appellant said that this apartment usually rented for $175, but that Anita's business would be so good that she could pay a lot more than the apartment was worth. Appellant handed Anita a key to the apartment, saying that she could move in at once. Appellant suggested that Anita should give the room clerk a check as though it were payment for the room, so that the clerk would not know what was going on. Anita replied that she had no funds in the bank, no bank account, and had once been arrested for giving a check for insufficient funds. Sheila said this would be alright, because the check would never be presented to the bank; that the appellant could not permit himself to be placed in that position. Appellant agreed that $80 would be a satisfactory amount for such check, and Anita then signed and delivered both the check and a registration card. She, thereupon, moved into the hotel with certain personal effects, including her clothing.

On October 2, appellant instructed Anita to dress in a sophisticated manner, and that she should join him in his room (No. 501); that he had people coming to meet her. She dressed and went to appellant's room, where she met a young woman named Marilyn Frazer, hereinafter called "Marilyn." The latter wore a dressing robe and slippers. Marilyn looked at Anita and told appellant that she approved of her appearance. Appellant said his friends were not expected for another 45 minutes, which would be about 3 a.m.; that they

should go to their separate apartments until he called them. They were, thereafter, directed to apartment 315, where Marilyn introduced Anita to two men.

Appellant had told the girls not to ask for money; that he would pay Anita the next day. A man by the name of Harry was assigned to Anita, who went with him to his room in the hotel. Marilyn took the other man to another room. Anita and Harry spent the hours from 4 a.m. until 9 a.m. in his room in the hotel, and they had sexual intercourse.

Thereafter, Anita returned to her apartment and appellant came in and said Harry was pleased, and that Anita was to reserve Monday of the following week for Harry. Appellant then asked Anita how much Sheila had said she was to get. Anita replied $50, and that on some occasions she might get as much as $100. Appellant then gave Anita $50. Anita had no information as to what Harry had paid. The only consideration that Anita gave for the money she received was sexual intercourse with Harry.

Anita continued with acts of prostitution in the hotel with a number of customers provided by Sheila. Appellant came to Anita and told her he had a friend named Roy from another hotel who wanted to see her that afternoon. Roy came, took her out for dinner, then returned to her room, where acts of intercourse took place until he left early the following morning. Appellant again visited her and said that Roy wanted to have her again that night. He placed a $50 bill on the table. Anita said that she did not want to see Roy as she was not feeling well because she was suffering from a back injury. Appellant responded that she was supposed to work, and he, thereupon, picked up the $50 bill he had placed on the table, and said: ''I'll see that you work.''

The doctor was called to examine Anita and he prescribed certain pills for sleep. She then tried to commit suicide by taking an overdose of such pills. She was taken to the receiving hospital, dressed only in a negligee. Sheila brought her shoes and a coat to her. When Anita returned to the hotel she found all of her clothing and effects had been removed from her room. Upon calling appellant, he told her that he had her things and she could get them back when she decided to go to work. She then called the police. Appellant told the police he would take care of Anita. He sent her food but did not return her clothing or personal things. She again called the police, and on this occasion she was taken to the police

station for investigation with reference to the $80 check she had given to the hotel at the time she had registered.

With reference to counts 2 and 3, appellant's accomplice, Sheila, testified that she met appellant about the year 1959 and discussed her business as a panderer with him. When appellant took over the hotel in question, she discussed with him the rental of an apartment and an arrangement by which she could put prostitutes in the hotel and receive 10 per cent of the rent they paid. She moved into room 202 of the hotel under an arrangement with appellant whereby she paid $40 a week and she should bring in prostitutes to use this room and other rooms. Appellant was to pay her 10 per cent of the rent of any rooms used by these prostitutes.

Appellant introduced her to a tenant of the hotel who was an alcoholic with substantial funds. He arranged for Sheila to provide this man with alcohol to keep him drunk, and to cash his checks. This man cashed checks for several hundred dollars during this period through Sheila, who gave appellant $50 or $75 of the money she received for her services.

Sheila further testified that about seven or eight months after she became a resident of the hotel, appellant called her to a meeting in his apartment with a cocktail waitress and bartender of the bar which was located in the hotel. It was agreed that prostitutes working out of the bar must pay appellant 15 per cent, and those who lived in the hotel should pay him double rent. Any customers requesting a prostitute would have their room rents increased. The customers would pay $25 or more for prostitutes. Sheila would get 40 per cent of this charge, and the prostitutes would keep 60 per cent. After this meeting, prostitution in the hotel increased to the point that, at one time, thereafter, she had as many as 50 girls working there. Additional prostitutes were called for men guests of the hotel. At appellant's direction, Sheila would provide a particular type of girl for a customer provided by appellant, the girl not to collect, herself, but the customer would pay either appellant or Sheila. Appellant would tell Sheila, in each instance, the amount to charge for the customer. During the year 1961 there were as many as 75 to 100 transactions with prostitutes per day in the hotel.

In September 1961 Sheila introduced Anita to appellant, and together they arranged for her to take room 116. Appellant suggested that Anita write a check for her room and register, to make it look good, and that she could use the

name Anita Shamback. Appellant told her that she would make a lot of money and could make the amount of her check in a day or two over the weekend. She then moved her personal effects and clothing into this room.

Later, in the presence of Sheila, appellant told Anita that he wanted her for a customer, and Anita complained that she could not continue prostitution because of her back injury. Sheila discussed this with appellant. Following Anita's visit to the hospital, Sheila took her to her own room (No. 206), and found that all of Anita's personal effects had been taken from her room 116. Anita called the police and told Sheila she was going to tell about the whole operation by appellant and others. Sheila, thereupon left the hotel and was later questioned by the police.

After the preliminary hearing of the instant case, appellant instructed Sheila to tell Anita that if she would not testify against him he would return her clothing and tear up her check.

About two months thereafter, appellant told Sheila that if she would change the testimony she gave against him at the preliminary hearing, he would get her $20,000. He also talked to her several times about helping her to go to Brazil.

Following the preliminary hearing, at which she had testified as a witness for the People, she was again arrested on a charge involving prostitution. Appellant had told her she could expect frame-up charges to be filed against her so she believed that this was such an arrest. Upon being bailed out, she was asked by an attorney to go to a shorthand reporter's office to make a statement. Without being placed under oath she there made a statement, in question-and-answer form, in effect repudiating her preliminary hearing testimony involving appellant. This statement was unsigned. It was read to her on cross-examination at the trial. On redirect examination, she said this statement was an act on her part for the benefit of appellant and his attorneys and was not the truth; that she learned that this prostitution arrest was not a police frame-up but resulted from a citizen's complaint; that she thereupon went to the office of the district attorney and reported full details of such false statement; that her testimony at both the preliminary hearing and the trial is the truth.

In defense of the charges against him relating to Anita, defendant denied any knowledge of her being a prostitute or of any acts of prostitution by her. He recalled that she

personally talked with him concerning renting an apartment and after showing her number 116 she moved in. He further recalled that Anita was later taken to a hospital by an ambulance, and that her clothing and personal effects were removed from her room to a storeroom. He told her he did not want her in the building any more, and that when she moved out he would return her things. He discussed Anita with the police officers, and complained to them about the check she had given for her rent. Sheila asked him for Anita's clothing. After the preliminary hearing, Sheila told him that if appellant would return her effects Anita would leave town. Anita never came for her property. He realized she was sick, and she repeatedly asked him for her clothes, and later sued him for the value of her clothes, but that he still had not returned them. While Anita lived at the hotel he did cash checks for her.

The evidence as to counts 4 and 5 relates to the charged offenses of pandering involving Shirley Doupnik. Shirley, who was at all times in question a regularly employed policewoman, first visited the hotel on November 24, 1961. She registered in room 504 in the name of Shirley Dupree, and went into the bar operated in the hotel. She ordered a drink and waited. In about 15 minutes a male undercover officer entered the bar from a side entrance and approached her. After a brief conversation she went through a back entrance from the bar to the second floor, then by the elevator to room 504. The officer followed her to her room, where they remained for about half an hour. This officer then left, and some 15 minutes later Shirley returned to the bar. She went through the same procedure with a second undercover officer. On her way to her room, she was intercepted by defendant Phillips, who said he was a friend of the appellant. He invited her to have a drink with him, but she refused and went on to her room where the second officer joined her. After the same interval, she again returned to the bar and a third officer followed the previous procedure. They made it a point to leave the room in disarray, and she returned to the police department.

On the following night, she again returned to the hotel and found her room as she had left it. She again went to the bar and followed the same procedure with another officer. Upon her return to the bar, she was joined by still another officer, when appellant entered the bar and sat close to them. He stared at Shirley and the officer for a period, and then left.

She went to her room, followed by the officer. She, thereafter, again returned to the bar several times under the same circumstances.

She did not return to the hotel for five days and, on November 29, did not register but went directly to the bar and talked with the bartender, telling him that she would return for that weekend, commencing Friday, December 1. On that day, she returned and rented a room for two days, again registering in the name of Shirley Dupree, and asked if she could have room 208 near the elevator on the second floor. She then repeated the procedure of meeting an officer in the bar and going to the room with him. This was repeated a second time and, upon this officer's leaving, her telephone rang and the person calling stated that he was Frey, the owner of the hotel, and that he would like to see her in his office. She attached sound equipment to her person, and went to his office (room 108) arriving near midnight. She found appellant and Phillips to be present. Appellant told her that she looked frightened, not to be, and that he knew what type of business she was in. He said he knew she was not experienced, because she was taking customers from the bar. She said she only took customers on weekends, that she was married but did not get along with her husband. After asking her to pose, Phillips said he would like to make a stripper out of her, whereby she could make $150 a week, and also get a customer each night. Appellant told her she could move into the hotel on a monthly basis, and that both he and Phillips could introduce her to customers. Phillips offered to introduce her to many people, and said that both he and appellant could teach her a lot. Appellant said her room rent would be $100 a month, and that she should get a private telephone. He said he had a girl working out of the hotel for about seven years and she had never been arrested. Shirley said she would think the matter over and would talk to them the next evening.

On December 2, in the evening, she again went to room 208, and found that it had been cleaned. She thereupon telephoned to appellant and he invited her to his office. He was alone, and she asked him about moving into the hotel, and how much she might expect to make. He told her that she was probably making $200 or $300 a weekend, as it was, and that Phillips would be there shortly and would take her out to introduce her to friends of his. She asked how much she should charge, and appellant said that they usually paid

about $25. He asked if she was going to get a divorce, and she replied that she was going to get it in Las Vegas. He told her he had a hotel there where she could stay, and that he had bartenders and friends there, so she could have customers while there. He said there were two girls in his own room at that time, and he also had a 22-year-old student that was a prostitute. He asked Shirley how old she was, and said he would have this young student take her to the race track and introduce her to men. She asked appellant if it would be necessary for her to give him any money. He said that would not be necessary because the men would be friends of his. She wore sound equipment during this conversation.

The accomplice Phillips testified that, in the summer of 1961, he talked with appellant about leasing the bar in the hotel. He also asked appellant about girls, and appellant said that, for $25, he could fix him up with a girl named Lynn. Appellant directed him to a room on the fifth floor, where he had an act of prostitution with Lynn, and paid her $25. Some days later, appellant told Phillips he had a new girl by the name of Adrian. He then went to a telephone and told someone he had a friend of his who would come up to see her. Again, Phillips went up to an indicated room and had an act of prostitution with this girl for $25. Appellant told Phillips to bring any good-looking girls he knew to him and that appellant could make some money with them; that the girls could make more money if they moved into his hotel. He heard appellant introduce a Marilyn Frazer to a man, stating that she was real nice and not very expensive.

Phillips recalled meeting Shirley in November 1961, having first seen her in the bar, and then being followed by men to a room in the hotel. He inquired concerning her from appellant and the bartender defendant Kittridge. He heard appellant tell her she was going to get caught, and that his girls did not work out of the bar, and that Phillips would introduce her to some men.

Corroborating testimony was given by a number of police officers. Officer Trembly testified that he investigated prostitution conducted at the hotel and, based on the evidence found, arrested both Sheila and appellant. Officer Haldi testified that he participated in the arrests made at the hotel near midnight of December 2, 1961. In addition to appellant, arrests were made of Madelaine Moss and Edna Mae Turner who were found with appellant in his room (501). Marilyn Frazer was arrested in the adjoining room (502). He found a

small notebook (People's exhibit 13) in the desk drawer in room 108, identified by appellant as his office. This is the same room where appellant twice interviewed Shirley. Evidence was later offered that this exhibit is a prostitute's so-called "trick book," carrying entries showing $50, $25 and up to $100 customers known as "tricks."

Officer Clarke testified that he participated in the arrest of appellant and Marilyn. On the living room table of room 502 he picked up a notebook (People's exhibit 15). Evidence was later offered that this is a combination "trick book" that carried not only the names of customers, but also of pimps and procurers. It carries the amounts received and the amounts paid out, mostly on a 40-60 percentage. The names and telephones of some 40 men were listed. Detailed information was given concerning many of these customers.

Officer Cory testified that, while he was seated in the bar covering policewoman Shirley, he talked with defendant Kittridge, who was the bartender in the hotel. Kittridge said he could tell Shirley was a prostitute and he introduced the officer to another woman who came into the bar. This girl offered to go with him for purposes of prostitution at an agreed price. She gave her name as Shannon and he made an engagement with her for later that evening, and upon her protesting the delay he gave her $5.00 and said he would return in an hour if possible. He returned several nights later and asked Kittridge how long Shannon had waited for him, and he said for several hours; that she would probably be in again that evening, but he could fix him up with someone else.

As to counts 4 and 5, appellant testified that he talked with Shirley and Phillips in his office and that he learned she was a prostitute. He did not ask her to leave the hotel, although he knew she had rented a room there. He recalled the offer of Phillips to get her a job as a stripper, and that he did offer a room in his hotel for $100 a month. She stated to him that she did want to be a prostitute, but claimed that he and Phillips were merely teasing her. He admitted seeing her the next night in his office and telling her that she could move in any time, and that she should have a private telephone installed. He discussed her going to Las Vegas and recalled telling her that she could work in his hotel there for her rent. He said he tried to talk her out of being a prostitute.

Several tenants and hotel employees testified that they were not aware of any prostitution going on in the hotel.

By way of rebuttal, Officer Olson stated that he worked with Shirley and her listening equipment, and monitored her conversations with appellant while he remained in a truck parked adjacent to the hotel. He recognized the voice of Shirley and he identified the voice of appellant. He fully verified the conversation between Shirley and the appellant in their two meetings in appellant's office room.

In addition to the evidence heretofore mentioned concerning the claimed attempts on the part of appellant to bribe Sheila to change her testimony and to leave the country, Sheila testified that appellant told her he would hire an attorney for her, and would handle everything. She would receive $500 for each witness she could bring in for him and $1,500 for Anita. He said he would make arrangements, through his son Leo, to compensate her for securing prostitutes who would serve as witnesses for appellant. Leo told her he would pay her $500 if she could get a statement favorable to his father from one Terry Holliday, a prostitute. He would pay Terry for testifying for the defense. Upon objection that this evidence was hearsay, as to appellant, the court ruled that, as to him, it would not be admissible, but that such evidence was to be received only as to Leo, an undisclosed member of the conspiracy. Thereafter, evidence was received as to this subject without further objection, and with the repeated admonition to the jury by the court that it was to apply solely as against Leo and not against appellant. This evidence concerned the payment by Leo of money to Sheila, and to Terry Holliday.

Terry testified that she was introduced to appellant in the office of the hotel about June of 1960 by her friend known to her as Brooksy. The latter, a prostitute, asked appellant if there was then any business in the hotel like it had been, and if so, she would like to move in again and bring Terry with her. He said yes she could move in. Brooksy rented a room. Terry met men in the hotel bar and took them to Brooksy's room for sexual acts. If she got the customer herself she kept all the money he paid her, but if someone sent him to her she would give them 40 per cent. Under this practice she paid money to Brooksy, the bartender, and to people who ran the hotel such as the assistant manager and clerks. She never paid anything to appellant. She worked there off and on for about one year.

Appellant, while admitting many conversations with Sheila following the preliminary examination, claimed it was she who requested $20,000, and that he refused any payments to her. Subsequently, appellant moved to strike all testimony relating to the claimed conversations between Sheila and Leo, which motion was granted, and the jury was admonished to entirely disregard it. Appellant now contends that the fact the jury heard such evidence resulted in serious prejudice to him notwithstanding its striking and the admonition of the court to disregard it.

In the light of the evidence relating to the direct acts and statements of appellant concerning the bribing, attempted bribing or influencing of witnesses and his telling Sheila he would make arrangements through his son Leo to compensate her for procuring witnesses who would testify for him, together with the belated motion by appellant to strike her testimony as to her conversations with Leo and the strong admonition then given by the court, in granting the motion, to disregard such evidence, appellant suffered no reversible prejudice thereby.

Section 266h of the Penal Code defines pimping as follows: ''Any male person who, knowing a female person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of her prostitution, or from money loaned or advanced to or charged against her by any keeper or manager or inmate of a house or other place where prostitution is practiced or allowed, or who solicits or receives compensation for soliciting for her, is guilty of pimping, a felony. . . .''

Section 266i of the Penal Code defines pandering. Pertinent portions thereof declare that any person ''who: (a) procures a female inmate for a house of prostitution; or (b) by promises, threats, violence, or by any device or scheme, causes, induces, persuades or encourages a female person to become an inmate of a house of prostitution; or (c) procures for a female person a place as inmate in a house of prostitution or as an inmate of any place in which prostitution is encouraged or allowed within this State; or (d) by promises, threats, violence or by any device or scheme, causes, induces, persuades or encourages an inmate of a house of prostitution, or any other place in which prostitution is encouraged or allowed, to remain therein as an inmate; or (e) by fraud or artifice, or by duress of person or goods, or by abuse of any position of confidence or authority, procures any female per-

son to become an inmate of a house of ill-fame, or to enter any place in which prostitution is encouraged or allowed within this State, ... or (f) receives or gives, or agrees to receive or give, any money or thing of value for procuring, or attempting to procure, any female person to become an inmate of a house of ill-fame within this State, . . . for the purpose of prostitution, is guilty of pandering, a felony. ..."

From the foregoing evidence, including the testimony of appellant himself, the jury as the trier of facts was fully justified in finding appellant guilty of the offenses of pimping and pandering as charged in counts 2, 3, 4 and 5 of the information.

As to count 2, competent evidence shows him to have been guilty of pimping and that he wilfully rented a portion of his hotel to Anita, a known prostitute, for personal gain. He profited not only through the rent charged, but from her earnings as a prostitute, by collecting money from customers he solicited and procured for her.

The charge of pandering in count 3 is likewise adequately supported. He knowingly procured the prostitute Anita as an inmate of his hotel, a portion of which he was operating as a house of prostitution. He induced and encouraged her to occupy a room therein and to become and remain an inmate thereof. He both received and gave money for procuring her to become an inmate of his house of ill-fame.

Fully corroborated evidence likewise entitled the jury to find appellant guilty of pandering as alleged in counts 4 and 5. Such evidence shows that, on or about the two occasions charged, he wilfully and knowingly agreed to give money and things of value for procuring and attempting to procure Shirley to become an inmate of his hotel, a portion of which he was then conducting as a house of ill-fame.

Count 1 charged that, between the latter part of 1959 and December 2, 1961, the appellant, in violation of section 182 of the Penal Code, wilfully conspired with Phillips and Kittridge to procure female persons for a house of prostitution. Three of the six overt acts set forth in the information in connection with this charge of conspiracy directly relate to the acts and conduct of appellant. Overt act one alleges that at all times in question he was the owner, manager and operator of the named hotel and that he did solicit female persons to practice prostitution therein. Overt act two

charges him with agreeing to let a room in his hotel to Anita at an agreed rental of $175 a month and to credit against said rental her earnings as a prostitute derived from male customers of prostitution which he would provide for her. Overt act five avers that he and Sheila entered into a business arrangement with other persons to provide the hotel and its bar with a supply of prostitutes.

The above related evidence is legally sufficient to support the charge of conspiracy and the commission by appellant of the described overt acts. This is particularly shown by the following: Phillips testified that he was with appellant in his office when Shirley was called in and he related in substance the conversations that appellant had with her at that time. Phillips was also with appellant when the latter introduced Marilyn Frazer to a jewelry salesman, telling him she was not very expensive. He was present when appellant sent Marilyn to another hotel through arrangements made by telephone. Phillips heard appellant state that Marilyn was a prostitute. Appellant also told Phillips to bring him any good-looking girls that he knew; that appellant could make money with them.

Kittridge, the bartender in the hotel, pointed out prostitutes to one of the investigating officers. He introduced this officer to a prostitute by the name of Shannon. When an arrangement with her did not work out, Kittridge offered to arrange that the officer meet another prostitute. Sheila referred to one of the bartenders as Al. This bartender was present during the organizational meeting when arrangements were made by the appellant for the future operations of the prostitutes in the hotel.

There was thus substantial evidence including corroborating evidence that connected appellant with each one of the offenses charged in the information. Appellant admitted that many of the transactions took place. In his own testimony he stated that he and Phillips had conversations with Shirley wherein Phillips said he would take her out and make a stripper out of her. Appellant also testified that Shirley said she wanted to go with men and appellant claimed he told her not to be a prostitute. He also admitted that there were many transactions with Anita and Sheila.

Appellant contends that there is no corroboration of the testimony of the alleged accomplices as required by section 1111 of the Penal Code. This section defines an accomplice as one who is liable to prosecution for the identical offense

charged against the defendant on trial in the cause in which the testimony of the accomplice is given. It further provides that a conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense.

The codefendants Phillips and Kittridge were clearly accomplices as was Sheila. Anita and Shirley were not accomplices and their testimony was properly received as valid corroborative evidence. In a prosecution under section 266h of the Penal Code, the prostitute whose earnings are taken is not an accomplice (*People* v. *Berger,* 185 Cal. App.2d 16, 19, 20 [7 Cal.Rptr. 827]); and under section 266i of the Penal Code, the woman who is induced or procured to become an inmate of a house of ill-fame is not an accomplice (*People* v. *Wilkins,* 135 Cal.App.2d 371, 378 [287 P.2d 555]).

The testimony of the accomplices, corroborated in whole or in part by that of Anita, Shirley, the several police officers, and the appellant himself, together with the other evidence, sufficiently supports the verdict and judgment herein finding appellant guilty of the offenses charged in all five counts of the information.

In addition to his contention of insufficiency of the evidence appellant urged prejudicial error as having occurred in several particulars of a nature necessitating a reversal of the judgment herein.

He says that sections 266h and 266i of the Penal Code inherently and as construed and applied in this case, are unconstitutional and in violation of due process of law in that they fail to define what constitutes a house of prostitution within the meaning of such statutes, that the court erred in the limited and insufficient definition given by its instruction as to what constituted a house of prostitution. In this regard the court properly gave the following instructions:

"Prostitution is the common, indiscriminate, illicit intercourse of a woman for hire.

"A 'house of prostitution' is a house in which a prostitute plies her trade.

" 'A prostitute' is a woman who offers herself indiscriminately to sexual intercourse for hire.

"A house of ill fame is synonymous with a house of prostitution."

The definitions as given by the court in the foregoing instructions are sufficiently clear and have been repeatedly ap-

proved. (*People* v. *Mitchell*, 91 Cal.App.2d 214, 217 [205 P.2d 101]; *People* v. *Head*, 146 Cal.App.2d 744, 748 [304 P.2d 761]; *People* v. *Courtney*, 176 Cal.App.2d 731, 739 [1 Cal.Rptr. 789].) As said in *People* v. *Marron*, 140 Cal.App. 432, 435 [35 P.2d 610]: "But aside from such decisions, it is common knowledge what is meant by the phrase. It is exceedingly doubtful that the meaning which is properly attachable to the expression is unknown to any adult, English-speaking person within the jurisdiction; —in consideration of which, together with the authorities to which attention has been directed, it must follow that the point advanced by appellant is wholly without merit."

Appellant also argues that there was no evidence in the record showing that the hotel in question was a house of prostitution and, therefore, it was error to give an instruction as to pandering. Further, that because there is evidence showing that part of the hotel is occupied by permanent guests having no connection with prostitution activities the building cannot be so classified. The authorities are clear, however, that one room of a building or a steamship is sufficient to constitute a house of prostitution and one person may keep such a place to which others resort for purposes of prostitution. (*People* v. *Courtney, supra,* at p. 739; *People* v. *Marron, supra,* at p. 435; *People* v. *Slater,* 119 Cal. 620, 622 [51 P. 957].) In the instant case there is substantial evidence that there were numerous prostitutes resorting to various rooms in the hotel for purposes of prostitution and the instruction as to pandering was necessarily and properly given.

 Appellant objects to the giving of an instruction on pimping for the same general reasons as those he advances concerning pandering, with the added claim that the instruction given herein on pimping was too vague and indefinite. That given, however, follows the exact language of the present statute, section 266h of the Penal Code, and it is difficult to see how this offense could have been more clearly outlined for the benefit of both the jury and the defendant.

 Appellant also contends that renting a room in the hotel to a prostitute could not constitute receiving money from the proceeds of prostitution. The evidence in the present case shows an arrangement whereby appellant did derive additional rent from the tenants that were provided prostitutes; that he did get proceeds from the prostitutes that rented his rooms for purposes of prostitution; that he know-

ingly permitted prostitutes to come into the hotel and took from them a percentage for their prostitution with his tenants.

Appellant also criticizes as inadequate the following instruction: ''The mere fact that an act of prostitution occurs at a certain place, does not by itself, prove that such place is one in which prostitution is allowed or encouraged.

''Merely procuring a female to engage in prostitution is not sufficient to convict the defendant of the crime of pandering as charged in the information. In addition thereto, it must be proved that the defendant procured the female to become an inmate of a house of ill-fame.'' Appellant does not designate wherein the claimed inadequacy occurs. It does not appear whether this instruction was requested by appellant or by the People. Certainly, it is an instruction that appellant would want the jury to receive. Only four instructions were refused and apparently no instruction offered by appellant covered the purpose of the quoted instruction more completely. It does not appear that any instruction offered by the appellant attempted to define a house of ill-fame. He concedes that the authorities in this state consider the terms ''house of prostitution'' and ''house of ill-fame'' as being synonymous (*People* v. *Courtney, supra,* 176 Cal. App.2d 731, 739 [1 Cal.Rptr. 789]; *People* v. *Charles,* 218 Cal.App.2d 812, 816 [32 Cal.Rptr. 653]). No error appears in the giving of this instruction.

Complaint is made of the giving of the following instruction: ''It is the law that the testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case.

''In giving this instruction I do not intend to imply any opinion of my own as to the credibility of any witness.'' It is urged that it was error to omit the words ''if any,'' in the second sentence thereof and that such words should have been inserted so as to have it read: '' ... but you should give to it the weight, *if any,* to which ... '' Without these words it is argued the instruction implies that some weight should be given the testimony of an accomplice. This instruction as given was for defendant's benefit and he offered no criticism of it at the trial. It is in the exact verbiage specifically approved by our Supreme Court in *People* v. *Barclay,* 40 Cal.2d 146, 153 [252 P.2d 321] as a correct statement of the law.

 Error is claimed in the court's instructions relating to the crime of conspiracy in that the detailed allegations as set forth in count 1 of the information, together with the charged overt acts, were not included. Some eight instructions were directed to the subject of conspiracy and the jury was properly advised with reference thereto as it applied to the within case. The information had been fully read to the jury at the commencement of the trial. The evidence, including that relating to the charge of conspiracy, had been discussed by counsel for both the prosecution and the defense in their summations for the jury. The instructions as given opened with the statement that it is the function of the jury to determine the issues of fact that are presented by the allegations in the information filed in the case. To require a reallegation in the instructions of the full charge, together with all the overt acts, would only serve to make the conspiracy instructions unnecessarily cumbersome rather than informative. The record shows that the jury was adequately informed as to the charges against the defendant. (*People* v. *Darnold,* 219 Cal.App.2d 561, 578, 579 [33 Cal.Rptr. 369].)

 Appellant complains as to the giving of an instruction relative to impeachment of a witness (CALJIC 54A) as having the effect of limiting the heretofore described unsworn extrajudicial statement of accomplice Sheila to testing her credibility as a witness rather than allowing it to be considered by the jury as proof of the facts related therein.

As above indicated, Sheila testified for the prosecution at both the preliminary hearing and the trial to the effect that she was a panderer and worked with the appellant in placing some fifty prostitutes in rooms of the involved hotel during 1961. Anita was one of the girls that Sheila brought to appellant and she assisted him in placing her as a prostitute in the hotel.

Under cross-examination, Sheila testified that after the preliminary hearing and prior to trial, she was taken to the office of a shorthand reporter where she made a statement. She was not under oath and the statement was not signed. After the statement was completed she went to the district attorney and reported fully on the fact she had made the statement.

The appellant now contends that this extrajudicial statement is more than a statement inconsistent with the testimony of Sheila. He urges that she was an accomplice and as such was an unnamed party and, therefore, her extrajudicial

statement should have been considered by the jury as proof of the facts related therein. However, if Sheila's extra-judicial statement is taken as fact, then it purports to say that appellant was free from guilt. If the appellant is not guilty, Sheila would not be an accomplice and could not be an unnamed party. (See 4 Wigmore on Evidence (3d. 1940) § 1048, p. 2.)

Moreover, no material prejudice could have been suffered by appellant by the claimed limitation as to the effect of this evidence. He submitted no proposed instruction covering his theory as now espoused. The jury heard in full an unsworn statement of Sheila and had ample opportunity to compare it with her sworn testimony as given both at the trial and the preliminary hearing.

Appellant additionally contends that, in offering Sheila's testimony at the trial with the knowledge that she had made an unsworn contrary statement following her previous testimony, the prosecution knowingly induced her to commit perjury; that such perjured testimony was knowingly offered against appellant and therefore his constitutional rights of due process were denied him. There is no merit to this argument.

Whether Sheila told the truth either in her testimony or in her statements under oath; whether she was impeached by the inconsistent unsworn statement and finally whether anything she said could be believed, were questions for the jury. Even if the jury determined that Sheila's unsworn statement was true, it would not follow that the prosecution knowingly used perjured testimony.

The fact that, following her sworn testimony at a preliminary examination, the witness came to the district attorney and told him she had made a false, unsworn, unsigned statement to a deposition reporter at the instance of attorneys for the appellant, would not be sufficient in and of itself to render false any subsequent testimony she might give under oath. Furthermore, any testimony given thereafter would not by that fact be false testimony known by the prosecutor to be false. Whatever may have been Sheila's purpose in giving an unsworn statement inconsistent with her sworn testimony, such an act would not be sufficient to warrant a claim that appellant was denied due process under the Constitution. To so hold would preclude the prosecution from using the testimony of any witness known to have made a prior inconsistent statement.

In the present case there was a full disclosure to the jury of all the statements that had been made by Sheila inconsistent with her testimony at the trial; the jury was given a full opportunity to weigh her credibility and to use her testimony for whatever value they considered it should have. The trial court gave proper instructions on the credibility of witnesses; that the testimony of an accomplice must be corroborated; that Sheila was an accomplice as a matter of law and that her testimony required corroboration.

The next question for our consideration is, was it prejudicial error for the court to fail, upon its own motion, to instruct the jury that charges of the character here under consideration are easily made and difficult to disprove and therefore the testimony of a complaining witness should be examined with caution.

Failure to give a cautionary instruction in a case where the charge is pimping has been held to be error. (*People* v. *McGhee*, 123 Cal.App.2d 542 [266 P.2d 874].) Even where the court fails, upon its own motion, to give such an instruction in a pandering case, a finding of error may be founded upon such failure in a proper case. (*People* v. *Quock Wong*, 128 Cal.App.2d 552, 558 [275 P.2d 778].) However, the question is always presented as to whether the evidence warrants a finding that the failure to give this instruction resulted in prejudice. In *People* v. *McGhee, supra,* the only evidence of appellant's guilt came from the complaining witness, a minor girl. The circumstances there were such as to arouse passion and prejudice. In *People* v. *Quock Wong, supra,* the complaining witness was also a minor and, although it was held to be error not to give the cautionary instruction, the court found that there were no inconsistencies of consequence in the testimony, the evidence was sufficient, and therefore the error was not prejudicial. In *People* v. *Bell,* 138 Cal.App.2d 7, 14-15 [291 P.2d 150], a pandering case, the court also found the evidence sufficient to support the judgment. Even though a cautionary instruction was requested in that case, the error in failing to give such an instruction was found not to be prejudicial.

In the present case no cautionary instruction was requested. Although one should have been given, it does not appear that such an instruction would have made any difference in the verdicts. There is substantial evidence, corroborated fully, to support the verdicts finding appellant guilty of both pimping and pandering and guilty of the con-

spiracy charged. Numerous witnesses testified to a web of transactions of prostitution involving not one but numerous prostitutes and their customers. Clearly no material prejudice here resulted from the omission to give such an instruction.

▊ Appellant also urges that the court was required to give an instruction covering the subject of entrapment because the policewoman Shirley was a feigned accomplice. That as such her acts may not be imputed to him. Under the evidence here presented no such instruction was necessary. There is no evidence in this case that Shirley was a feigned accomplice. She was not an accomplice with the appellant in any act that could be considered as any crime charged to him. When she pretended to be operating as a prostitute, appellant sought her out and offered to place her in the hotel as a working prostitute under his direction. There was no evidence offered on the defense of entrapment. ▊ Where an accused has a preexisting criminal intent, the fact that, when solicited by a decoy, he commits a crime, raises no inference of any unlawful entrapment. (*People* v. *Alamillo,* 113 Cal.App.2d 617, 620 [248 P.2d 421].)

▊ Appellant for the first time on this appeal, objects to the receipt in evidence of Exhibits 13 and 15, being the so-called "trick books." He now contends they were improperly received as they were obtained as a result of an unlawful search and seizure.

The book Exhibit 15 was in plain sight on a table in the room adjoining appellant's and in which the arrest of Marilyn Frazer took place. She was known to appellant to be a prostitute as the evidence discloses he told Phillips she was and he sent her to another hotel in response to a telephone request for a prostitute. Exhibit 13 was found at about the same time in a desk drawer of appellant's office room, in the hotel. That this office had been used by appellant in connection with the unlawful activities herein charged is shown by the testimony of Shirley. Where, as here, the arrest of appellant and others was based on reasonable cause to believe that he was involved in a conspiracy to commit pimping and pandering the search and seizure was not unlawful. (*People* v. *Reed,* 188 Cal.App.2d 395, 410 [10 Cal.Rptr. 536].)

These books were under the dominion and control of appellant at the time of his arrest. Prostitution was being conducted on a wide scale in his hotel. The books reflected that prostitution transactions were being conducted and recorded.

These records were identified as such by an expert. No question of illegal search was raised at the trial and nothing in the record appears on which a question of illegal search could be reviewed upon this appeal. These books definitely have a relationship to the facts in dispute and as such were admissible for consideration by the jury. (Code Civ. Proc., § 1954.) The paraphernalia of horseracing have repeatedly been held to be identifiable and admissible in like circumstances. (*People* v. *Cohn*, 94 Cal.App.2d 630, 641 [211 P.2d 375].)

Appellant cites several instances whereby he claims he did not get a fair trial. He points to an occasion when, during a court recess, a news reporter sought his picture. He shielded his face with a newspaper. A reporter lighted a match to the paper. Appellant, feeling that one or more jurors may have seen this, called the matter to the attention of the court. A strong admonition to the jury to disregard the incident followed. No motion for a mistrial was made.

On another occasion one of the jurors was addressed by a spectator in favor of appellant. This was not called to the attention of the court until after the jury had been instructed and had retired for deliberations. The court addressed the person who admitted he had spoken to the juror but said he was just joking. The court excoriated the person and ordered him from the courtroom. There is nothing to show that any juror was improperly influenced by this incident. No objection was addressed to the trial court and it should not be heard now for the first time on this review. (*People* v. *Pyle*, 44 Cal.App. 130, 133 [185 P. 1019]; *People* v. *Currie*, 3 Cal.App.2d 31, 33 [39 P.2d 215].)

Several other matters are mentioned as having tended to deprive appellant of a fair trial. These either have been fully covered under other points previously discussed or are of insufficient consequence as to merit further consideration. The record discloses that appellant was accorded a full and fair trial. The verdict of guilty as to each count is supported by the evidence. No error of any substantial character appears and the order made herein granting probation is affirmed.

Fourt, Acting P. J., and Lillie, J., concurred.

A petition for a rehearing was denied June 30, 1964, and appellant's petition for a hearing by the Supreme Court was denied August 12, 1964.