[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1421 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1422 
OPINION
 INTRODUCTION
Michael Barrett Cason (defendant) asserts that the evidence adduced at trial is insufficient to support three of his four convictions. We will affirm.
 FACTS AND PROCEDURAL HISTORY
Defendant was on probation in two prior felony cases when, on April 28, 2008, the District Attorney of Riverside County filed an information charging him with two counts each of pimping (Pen. Code, § 266h; counts 1 2), [1] and pandering (§ 266i; counts 3 4). As to pimping, the information alleged that defendant willfully and unlawfully solicited Jane Doe No. 1 (Q.) and Jane Doe No. 2 (P.) to be prostitutes and lived and derived support from the earnings of their prostitution (counts 1 2). As to pandering, the information alleged, in the language of section 266i, subdivision (a)(1) and (2), that defendant procured Q. and P. "for the purpose of prostitution and by promises, threats, violence and by device and scheme, cause, induce, persuade and encourage [each of them] to become a prostitute" (counts 3 4). The information further alleged that a year earlier, on April 27, 2007, defendant had been convicted of making criminal threats (§ 422), a serious and violent felony within the meaning of the three strikes law. (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1).)[2]
Jury trial began on September 3, 2008. Q., D., H., and two sheriff deputies, Rohn and Staton, testified for the People. P. did not testify. Defendant did not testify and called no witnesses. *Page 1423 
Q.
Q. was in debt and living with her parents in San Diego when, in June 2007, for the first time, she posted an Internet advertisement offering to provide time and companionship to persons who were willing to pay her. The day she posted the ad, defendant called and offered her employment as a prostitute. If she would work for him, he said, he would take care of her and pay her outstanding car and telephone bills. He would post advertisements and all she had to do was "take the calls" and "give him the money." Defendant talked to Q. for about an hour.
On June 11, 2007, the day after he called her, Q. drove to Temecula to meet defendant. She agreed to work for him and stayed at his house that night. The next morning, D., who lived with defendant and also worked for him, accompanied Q. to the Comfort Inn in Temecula for her first day of work. The women both had cell phones defendant gave them and on which customers could call to make "dates." Through his computer, defendant monitored their calls. If Q. missed any calls or stopped answering the phone, defendant would contact her and ask her why she was not answering the phone. Defendant posted Q.'s services at $200 for each half hour and gave her a daily quota of $1,000. Because she was "just a prostitute," she gave all the money she made, including tips, to defendant.
Q. did not like the work and tried to leave defendant's employ on several occasions. When she told him she wanted to go home, he refused to give her any money. Defendant told Q. she would never make it without him, that she "wasn't good enough" and "didn't have the looks" to be successful by herself. Nonetheless, Q. "quit" five or six times, by turning in her phone and driving back to her parents' Home in San Diego. When she again found herself in debt, she sometimes worked for a pimp in San Diego, "DK." She returned to work for defendant because, unlike DK, he did not hit her.
In August 2007, Q. reported defendant to the police. At trial, she testified that she was angry at defendant, as opposed to DK, because it was defendant who had first recruited her to work as a prostitute. She had never engaged in any acts of prostitution before she met defendant.
D.
D. was working as a clerk at Walgreen's in Hemet when she met defendant in 2005. Defendant told her she was beautiful and that he would like to take her and her two-year-old daughter to Disneyland. In the beginning, D. and *Page 1424 
defendant had a boyfriend-girlfriend relationship and talked about getting married. However, a few weeks after they began dating, defendant revealed that he ran an escort business and talked to D. about some of the girls who worked for him.[3] Eventually, D. began working for defendant too. Defendant photographed her with other prostitutes and posted their pictures, along with phone numbers and prices coded in "roses" on the Internet Web site, craigslist. P. was one of the girls who worked for defendant and with whom defendant photographed D. for ads he posted. Some of the photographs were taken in a house in Temecula where D. lived with defendant. D. saw defendant in their kitchen writing and posting Internet advertisements containing photographs of P. and other girls.
D. worked for defendant from July 2006 to August 2007. She stopped for four months between January and May 2007, hoping she could regain custody of her daughter, who had been taken by child protective services. In those four months, D. worked as a hostess at a restaurant. Defendant repeatedly called and came to the restaurant or to her apartment and tried to persuade her to return to work for him. To avoid him, D. sometimes would not answer the phone or the door. Eventually, because she needed money so badly, she returned to work for defendant. D. was afraid to leave lest, "all this stuff he told me happened to the girls that told, would happen to me."
When she worked for defendant, D. would sometimes accompany and transport defendant's other girls to hotel rooms where she and they would wait for customers to call their cell phones. Defendant had a laptop computer that "went everywhere he went" and on which he could monitor their calls and post Internet ads. In addition to their photographs and phone numbers, defendant set and posted varying prices for their services. The prices varied by city and the amount of time and number of girls a customer wanted. All the girls had a quota of $1,000 a day. All the girls gave defendant all the money they made every day. As soon as a client paid D., she took the money directly to defendant.
In May 2007, defendant and D. moved together to a house in Temecula, which D. and M.O. — another girl who worked for defendant — rented for $2,300 per month with money orders defendant gave them. Defendant gave D. money for groceries and beauty supplies, but never any money for herself.
D. was arrested with defendant on August 27, 2007, and charged with four identical felonies. By the time of defendant's trial, however, her charges had *Page 1425 
been reduced to misdemeanors in exchange for a guilty plea. During testimony, D. identified eight different photographs of P., taken by defendant and posted by him on the Internet. D. said she had never worked as a prostitute before meeting defendant and did not work as a prostitute after his arrest. She never recruited other girls to work for defendant.
H.
H. and D. had been friends since they were in seventh grade. H. met defendant when she was visiting D.'s apartment, where she observed him "posting girls" on craigslist. Defendant told H. she was beautiful, that she was what guys wanted, and that "a guy could make a lot of money off a girl like [her]." He suggested a number of "really dumb reasons" why she should be a prostitute: D. was doing it; if H. did it, he would buy her a car; since she was having sex anyway, she might as well get paid for it. However, he would be keeping all the money she made because if he gave it to her, she would "spend it too fast." And if they got her a car, it would be in his name. H. did not go to work for defendant. Because she was worried about her friend, she told D.'s mother about what D. was doing.
Rohn and Staton
On August 15, 2007, in the course of investigating defendant, Rohn and fellow deputies staked out the Comfort Inn in Temecula. About 9:00 p.m., Rohn saw defendant pull up to the hotel in a red Nissan truck and drop off a "Hispanic female." The woman, dressed in a "revealing outfit," entered room 319. Subsequently, about 20 minutes apart, two different middle-aged men came to the hotel, went to that room, and left after 10 to 15 minutes. Shortly after the second man departed, the Hispanic female left the hotel with a "white female" who appeared to be in her mid-20's and was also dressed seductively. Rohn lost sight of the women after they left the parking lot, but called "the rest of the team" to let them know.
Staton had worked in law enforcement for almost 20 years before taking a job in the Riverside County Sheriff's Department, where he had worked for two and one-half years. Staton had been assigned to the special enforcement unit and had received training in prostitution and pimping. He testified about the recruitment and Internet advertising methods used by pimps: within hours of posting their first ads, new girls get calls from pimps who offer protection, food, more money, or a better life. When a girl goes to work for a pimp, "the girl does all the work, the guy gets all the money." *Page 1426 
Staton and two fellow deputies investigated defendant. They had seen his Internet advertisements and had printed out craigslist photographs of prostitutes, including Q., D., and P., who worked for defendant. At one point, Staton and two other deputies conducted a traffic stop of D. and P. and later ran their DMV (Department of Motor Vehicles) photographs. Staton recognized the two as girls who had appeared in defendant's Internet advertisements.
On August 27, 2007, Staton served a search warrant on defendant's home in Temecula. The deputy recognized the house as the setting for many of the Internet photographs advertising defendant's prostitutes. During the search, the following items were found inside: red satin sheets and sex toys seen in the photographs, a "Little Red Riding Hood" outfit worn by D. in one of the photographs, five or six cell phones, $648 in cash in the pocket of a man's large shirt, a key to a room at the Comfort Inn, and defendant's probation papers.
At the close of evidence, defense counsel moved for a judgment of acquittal on counts 2 and 3. (§ 1118.1.) Because Q. and D. were prostitutes, counsel argued, under section 1111, they were "accomplices and coconspirators" whose testimony could not be used to corroborate each other or to substantiate the charges against his client. Without their testimony, counsel reasoned, there was no evidence that defendant had procured P. or that she had ever actually been a prostitute, had worked for defendant, or had given him money.
In explaining its decision to deny the motion, the court agreed with the prosecutor that the photographs of P. with D. posted on craigslist, along with the testimony of H., Rohn, and Staton, corroborated D.'s statement that P. also worked for defendant as a prostitute. Although P. did not testify and no witness directly observed her giving defendant money, the court said the jury could reasonably infer from all the evidence that he had not posted her photographs on the Internet without expecting remuneration, that she had worked for him on the same terms as the other girls, and that she too had given him money.
The jury found defendant guilty on all four counts and the court sentenced him to a total of 10 years eight months in state prison.
 DISCUSSION
Defendant contends here, as he did below, that Q. and D. were both accomplices and coconspirators whose testimony was worthless. Because Q. testified under a grant of immunity, while D.'s charges were reduced from *Page 1427 
felonies to misdemeanors in exchange for a guilty plea, he insists that their evidence was not credible and was otherwise insufficient to support an inference that he pimped P. or pandered her or Q. Like the trial court when it denied his motion for acquittal, we do not find defendant's arguments persuasive.
Standard of Review
The standard used by a trial court in ruling on a section 1118.1 motion is the same as that used by an appellate court to assess the sufficiency of the evidence to support a conviction. (People v. Mincey (1992) 2 Cal.4th 408, 432, fn. 2 [6 Cal.Rptr.2d 822, 827 P.2d 388].) "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — that is, evidence that is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (People v. Rodriguez (1999) 20 Cal.4th 1, 11
[82 Cal.Rptr.2d 413, 971 P.2d 618] (Rodriguez), citingPeople v. Johnson (1980) 26 Cal.3d 557, 578
[162 Cal.Rptr. 431, 606 P.2d 738].) "Under this standard, the court does not `"ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (People v. Hatch (2000) 22 Cal.4th 260, 272
[92 Cal.Rptr.2d 80, 991 P.2d 165], quoting Jackson v.Virginia (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560,99 S.Ct. 2781].) The standard is the same where the prosecution relies mainly on circumstantial evidence. (Rodriguez,supra, at p. 11, citing People v. Stanley (1995)10 Cal.4th 764, 792 [42 Cal.Rptr.2d 543, 897 P.2d 481].) "The credibility of the witnesses is an issue for the trier of fact and the judgment of the trial court will not be reversed unless there is no substantial evidence in the record that will support the conclusion of the trier of fact." (People v.Hashimoto (1976) 54 Cal.App.3d 862, 866
[126 Cal.Rptr. 848] (Hashimoto).)
Pimping and Pandering
Section 266h provides, in relevant part, that "any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution . . . or who solicits or receives compensation for soliciting for the person, is guilty of pimping. . . ." (§ 266h, subd. (a).) "[S]ection 266h can be violated in either of two basic ways: (1) byderiving support from the earnings of another's act of prostitution or (2) by soliciting. In order to *Page 1428 
violate the statute by soliciting, there must beeither the receipt of compensation for soliciting for a prostitute or the solicitation of compensation for soliciting for a prostitute." (People v. McNulty
(1988) 202 Cal.App.3d 624, 630 [249 Cal.Rptr. 22] [Fourth Dist., Div. Two].)
Subdivision (a)(1) and (2) of section 266i provide, respectively, that a person is guilty of pandering if he does any of the following: "[p]rocures another person for the purpose of prostitution"; or "[b]y promises, threats, violence, or by any device or scheme, causes, induces, persuades or encourages another person to become a prostitute." (Italics added.) Procurement encompasses a broad range of conduct, including the solicitation of a former prostitute to reenter the profession; it is not necessary that the victim ever actually perform acts of prostitution. (People v. DeLoach (1989) 207 Cal.App.3d 323, 333
[254 Cal.Rptr. 831] (DeLoach).) "The commission of any one of the acts described . . . constitutes the offense of pandering. . . ." (People v. Charles (1963)218 Cal.App.2d 812, 816 [32 Cal.Rptr. 653] (Charles), citing People v. Montgomery (1941) 47 Cal.App.2d 1,23-24 [117 P.2d 437] (Montgomery), disapproved on another ground in People v. Dillon (1983)34 Cal.3d 441, 454, fn. 2 [194 Cal.Rptr. 390, 668 P.2d 697] [Dillon disapproved on still another ground inPeople v. Chun (2009) 45 Cal.4th 1172, 1185
[91 Cal.Rptr.3d 106, 203 P.3d 425]].) "The subdivisions of the . . . statute do not state different offenses but merely define the different circumstances under which the crime of pandering may be committed." (People v. Lax (1971)20 Cal.App.3d 481, 486 [97 Cal.Rptr. 722] (Lax).)
Sections 266h and 266i are closely related. Both are "designed to discourage prostitution by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes." (Hashimoto, supra, 54 Cal.App.3d at p. 867; see alsoDeLoach, supra, 207 Cal.App.3d at p. 333.)
Accomplice Testimony
We first address the question of whether, as defendant maintains, Q. and D. were accomplices such that their testimony required corroboration.
Generally, an accomplice is a person who is liable to prosecution for the identical offense with which the defendant is charged; a defendant's conviction cannot be sustained solely on the uncorroborated testimony of such a person. (§ 1111.) However, "it has been uniformly held in this state that the woman who is exploited by a male in violation of section 266h is not an accomplice of the man who exploits her." (Peoplev. Berger (1960) 185 Cal.App.2d 16, 19-20
[7 Cal.Rptr. 827].) "[T]he prostitute whose earnings *Page 1429 
are taken is not an accomplice. . . ." (People v.Frey (1964) 228 Cal.App.2d 33, 52 [39 Cal.Rptr. 49] (Frey).)
Under these rules, Q. and D. were not defendant's accomplices: they were exploited women who told similar stories about how he recruited them into prostitution and kept them there despite their efforts to leave. It is true that Q. had posted a "companionship" advertisement on the Internet, but she had never actually worked as a prostitute before defendant contacted her and talked her into entering his employ. When Q. tried to leave, he denigrated her and refused to give her any money. In D.'s case, defendant's actions were even more egregious; D. had posted no Internet advertisement. She was working as a clerk in a drugstore to support herself and her two-year-old child when defendant approached and began flattering and flirting with her. When D. tried to leave him, at least partially in hope that she could regain custody of her child, defendant showed up at her new job and harried her until she returned to work for him.
Defendant particularly urges that none of D.'s testimony was credible because she was charged with the same crimes as he. We do not find this dispositive. In People v. Frayer
(1956) 140 Cal.App.2d 597, 598-599 [295 P.2d 456], the court noted that while "a woman who assists in the exploitation of another woman is in the same position as the exploiter," a woman "who permits herself to be criminally exploited is not in the same relation to the crime and does not approach it from the same direction as the exploiter." (See also Frey,supra, 228 Cal.App.2d at pp. 51-52; People v.Pangelina (1981) 117 Cal.App.3d 414, 422
[172 Cal.Rptr. 661].) D. was charged with the same crimes as defendant, but she did not approach them from the same position. It is true that D. sometimes drove other prostitutes to hotels where they worked together, but this does not appear to have been accomplice activity within the meaning of sections 1111 and 266h. There was no evidence that D. recruited other girls into defendant's ring or solicited for their prostitution; she did not post their photographs, phone numbers, or prices on the Internet; and she did not profit from their work.
Moreover, even when the witness may be considered an accomplice, the amount and nature of evidence required to corroborate her testimony is "`slight.'" (People v.Avila (2006) 38 Cal.4th 491, 562-563 [43 Cal.Rptr.3d 1,133 P.3d 1076].) "It is sufficient when the evidence offered as corroborative tends to connect a defendant with the commission of the crime in such a way as reasonably may satisfy a jury that the accomplice is telling the truth. It is not necessary that the accomplice be corroborated as to every fact to which he testifies. If his testimony could be completely proven by other evidence, *Page 1430 
there would be no occasion to offer him as a witness." (People v. Trujillo (1948) 32 Cal.2d 105, 111
[194 P.2d 681].)
Q.'s and D.'s testimony about how defendant procured them for the purpose of prostitution and derived support from their work was amply corroborated by H., Staton, and Rohn. The evidence of these nonaccomplice witnesses connected defendant with the commission of the crime in such a way that the jury could be well satisfied that the two women were telling the truth. Both testified as to how they were recruited and kept, and how defendant took all the money they earned. H. corroborated these statements by recounting the details of defendant's efforts to recruit her: if she worked for him, he would take all her money because otherwise she would spend it too fast; and if she got a car, it would be in his name. Staton testified that this was standard industry practice: "[T]he girl does all the work, the guy gets all the money." Rohn had actually seen defendant drop a woman off at the Comfort Inn for what appeared to be prostitution activities.
Pimping P.
Substantial evidence also demonstrated that defendant violated section 266h by pimping P., just as he pimped Q.: by advertising her for prostitution, taking the proceeds of this activity, and living on her earnings. As D. and Staton credibly testified, defendant included photographs of P. in his prostitution advertisements on the Internet. As D. and Q. testified, defendant took all the money his girls earned as prostitutes. The trial court correctly observed that there was no reason to believe defendant had posted P's photographs without expecting remuneration, just as he did from his other girls, and that the jury could reasonably conclude that P. too had paid him.
Finally, there was no doubt that defendant lived, and lived well, deriving support from the earnings of all his prostitutes. Defendant resided in a $2,300-a-month house paid for with money orders passed, through D., to the owner. He had a laptop computer. He drove a Lexus while most of his girls had no car. One of the two who did have cars had a Camry; the other lost her car after it broke down and defendant reneged on a promise to retrieve it for her if she would return to work for him.
Pandering Q. and P.
Defendant relies on a recent case from Division Three of this district, People v. Wagner (2009) 170 Cal.App.4th 499
[87 Cal.Rptr.3d 881] (Wagner), for the proposition that he could not have pandered Q. "to become" *Page 1431 
a prostitute because she was already "actively seeking work" as one when he contacted her. In Wagner, the defendant pimp was charged with violating section 266i after he called out to a streetwalker to come and work for him. (Wagner, at pp. 502-504.) On appeal from his conviction under subdivision (a)(2) of the statute, the defendant contended that the trial court erred when it gave a modified instruction which added language specifying that pandering occurs when "the defendant encourages or solicits one who is already a prostitute to `change her business relationship. . . .'" (Wagner, at p. 502.) The Court of Appeal reversed his conviction, acknowledging as it did so that its interpretation conflicted with established case law, which it characterized as "utterly unconvincing." (Id.
at p. 506.) Among the cases Wagner found unconvincing were People v. Bradshaw (1973) 31 Cal.App.3d 421
[107 Cal.Rptr. 256] (Bradshaw), Hashimoto, supra,54 Cal.App.3d 862, and People v. Patton (1976)63 Cal.App.3d 211 [133 Cal.Rptr. 533] (Fourth Dist., Div. Two) (Patton). (Wagner, at p. 506.) All the earlier decisions were wrong, the Wagner court said, because it was impossible to solicit a woman who was "currently a prostitute" to become one. (Id. at pp. 505-506.) "If the Legislature had wanted a more broadly applicable provision," the Wagner court suggested, "it could have easily replaced the phrase `become a prostitute' with the phrase `engage in prostitution.'" (Id. at p. 509.)
In Bradshaw, the defendant was charged with pandering after he made a deal with an undercover policewoman to set her up as a prostitute and split her fees. (Bradshaw,supra, 31 Cal.App.3d at p. 423.) At trial, the prosecution argued that while the defendant had admittedly not successfully "`caused, induced, or persuaded'" the officer to become a prostitute, he had "`encouraged'" her to do so and had so violated former subdivision (b) (now subd. (a)(2)) of section 266i. (Bradshaw, at p. 424.) The defendant countered that "encourage" implies success and that "`to become'" means that "the woman involved cannot have been a prostitute prior to defendant's persuasive activities." (Ibid.)
Relying upon the combined effect of Lax andFrey, the Bradshaw court rejected both these contentions.[4] (Bradshaw, supra,31 Cal.App.3d at pp. 425-426.) "[S]uccess is not a necessary element of the offense proscribed by the word `encourage' as used in subdivision (b) of section 266i." (Id. at p. 425.) Similarly, the court concluded that the results in Lax
and Frey, along *Page 1432 
with language in Charles, [5] meant that the statute covers "cases where a defendant has solicited one whom he believes to be a former prostitute to re-enter the profession and a defendant who solicits one whom he believes presently to be a prostitute to change her business relations." (Bradshaw, at p. 426.) Hashimoto andPatton, as well as a number of other cases, followed the rule of Bradshaw. (See, e.g., People v.Jeffers (1987) 188 Cal.App.3d 840, 855 [233 Cal.Rptr. 692] (Jeffers); DeLoach, supra, 207 Cal.App.3d at p. 333.)
Like Lax and Charles, Hashimoto quoted, with approval, the purpose of the antipandering statute as stated inMontgomery: "to `cover all the various ramifications of the social evil of pandering and include them all in the definition of the crime, with a view of effectively combating the evil sought to be condemned.'" (Hashimoto, supra,54 Cal.App.3d at p. 866; see also Lax, supra,20 Cal.App.3d at p. 487; Charles, supra,218 Cal.App.2d at p. 816.)
The Hashimoto court also cited Aguilera v.Superior Court (1969) 273 Cal.App.2d 848
[78 Cal.Rptr. 736] (Aguilera). There, the appellate court found that "[i]t is not stretching the logic of the wording, considering the broad purpose of the entire code section . . ." to construe language prohibiting a person from encouraging another to remain an "`inmate'" of a "house of prostitution," to also refer to a maitre d's encouraging a prostitute to use her apartment for prostitution. (Aguilera, supra, at p. 852.) A number of other cases where courts of this state deflected attempts by panderers to weasel out of their convictions by straining at particular words or phrases within subsections of the statute can be traced throughAguilera and authorities it cites. (See, e.g.,People v. Martin (1964) 228 Cal.App.2d 677, 680
[39 Cal.Rptr. 669] [the word "`procure'" does not include an element of compulsion and "`house of prostitution'" can be an apartment]; People v. Nasworthy (1949)94 Cal.App.2d 85, 91 [210 P.2d 83] [a taxicab can be a house of prostitution]; People v. Slater (1898) 119 Cal. 620,622 [51 P. 957] [a single room occupied by a single woman can be a house of prostitution].)
In Patton, this court reviewed Bradshaw andHashimoto in detail and concurred fully with the rule of the two earlier cases. In so doing, we rejected *Page 1433 
the exact argument now accepted in Wagner, that because of the use of the word "become," a prostitute cannot be pandered. (Patton, supra,63 Cal.App.3d at pp. 215-218.) "The fallacy involved in this reasoning," we said, "is the assumption that the Legislature was concerned only with actual, rather than potential, harm." (Patton, at p. 218.) Like the two earlier cases, we quoted the purpose of the law as stated in Montgomery, noting in addition that although the language of the pandering statute "proscribes conduct in the nature of an attempt[,] . . . the relevant social policy question is the potential for harm which defendant's conduct reveals." (Patton, at p. 218.) The act of encouraging even "an established prostitute to alter her business relations . . . indicates a present willingness to actively promote the social evil of prostitution." (Ibid.)
Conceptually, we see another problem with reasoning that narrowly interprets the phrase "become a prostitute" as meaning to change one's state of being. This somewhat old-fashioned notion, [6] seems to ignore the fact that to "be" a prostitute necessarily involves "engaging in" the prohibited criminal activity. "[C]ourts are [not] always to be governed by the exact phraseology and literal meaning of every word or phrase employed. . . . [C]ourts will not blindly follow the letter of a law, when its purpose is apparent, to consequences which are inconsistent with that purpose; and this would seem to be particularly true when the results of a literal interpretation, if adopted, would be absurd. . . ." (In re Davis
(1936) 18 Cal.App.2d 291, 295-296 [63 P.2d 853].)
The purpose of section 266i as stated in the cases we have discussed is apparent, and to hang everything on one literal meaning of the word "become" would generate consequences inconsistent with that purpose. Thus, in our view, the Legislature does not need to change the wording of section 266i from "become a prostitute" to "engage in prostitution." (Wagner, supra, 170 Cal.App.4th at p. 509.) The latter concept is necessarily contained within the former. The statute as worded, and as interpreted by a long line of cases from California courts, is adequate. It covers acts encouraging even "an established prostitute to alter her business relations." (Patton, supra, 63 Cal.App.3d at p. 218.)
We add here that we consider the act of contacting a person who has placed an advertisement for possible prostitution on the Internet, and persuading *Page 1434 
her to become an actual — as opposed to a potential or virtual — prostitute by engaging in acts of prostitution, a violation of section 266i.
Assuming, for the sake of argument, that Wagner is correct as to its legal analysis, the facts here are different. Firstly, our defendant was charged in the language of subdivision (a)(1) and (2) of the statute and was found guilty of two violations of "section 266i," not specifically or only of subdivision (a)(2). Secondly, our defendant did not call out to a streetwalker, as did the defendant in Wagner. He telephoned a woman, who had placed her first advertisement on the Internet, and talked her into joining his ring. Despite the posting, Q. had never actually engaged in prostitution before she met defendant. Later, when she tried to quit, defendant refused to give her any money, denigrated and discouraged her, and persuaded her to come back. Even if she somehow approached him first by placing the ad, that does not preclude a finding that he pandered. (Jeffers, supra,188 Cal.App.3d at p. 854, fn. 2.)
Because P. did not testify, there was no direct evidence as to how defendant got her into his ring. But there was abundant evidence about his depressingly unvaried recruitment methods and how he went about pandering and procuring. D., Q., and H. all gave similar accounts. He contacted vulnerable young women inexperienced in prostitution and, with promises of increased income or debt relief, safe working conditions, and the possible purchase of a car, persuaded them, or tried to persuade them, to work for him. It was not unreasonable for the jury to conclude that he had done the same with P. Whether P. was formerly a prostitute or ever got any customers through defendant's efforts was irrelevant. (DeLoach, supra,207 Cal.App.3d at p. 333.)
In 1922, a California court found a defendant who "stood at the door of [the prostitute's] room and demanded and received the money from the men who entered without handing any of it over to her," guilty of pimping, in violation of a precursor statute of sections 266h and 266i. (People v. Navarro (1922)60 Cal.App. 180, 182 [212 P. 403].) Defendant's actions represent the modern version of the same enterprise. The "door" to a prostitute's "room" now opens through an Internet Web site. It is at this virtual door that defendant stood, soliciting for, and ultimately collecting money from, the services of Q. and P. *Page 1435 
 DISPOSITION
The judgment is affirmed.
McKinster, J., and King, J., concurred.
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] Although we do not have the records, the two prior felonies for which defendant was on probation were apparently the section 422 "strike," and a section 273a, willful injury to a child conviction.
[3] At different times, D. met, or heard from defendant about, eight other girls who worked for him: Ashley, Nicole, Jessica, Melissa, Erin, Lea, a girl from Bakersfield, and a girl from Texas.
[4] In Lax, the defendant was unsuccessful because the woman he persuaded to become a prostitute changed her mind before engaging in any acts of prostitution. (Lax, supra, 20 Cal.App.3d at p. 485.) InFrey, the defendant was unsuccessful because, as inBradshaw, the targeted woman was a police officer. (Frey, supra,228 Cal.App.2d at p. 58.)
[5] "Whether the female person procured for or encouraged to become an inmate of a house of ill-fame is `an innocent girl or a hardened prostitute of long experience' is immaterial to the issues raised by a charge of pandering." (Charles, supra, 218 Cal.App.2d at p. 822, quotingMontgomery, supra, 47 Cal.App.2d at p. 12.) AlthoughBradshaw quoted Charles quotingMontgomery, it noted that neither of the earlier courts had supported the statement with analysis and thatCharles had resolved its own case as an attempt rather than under former subdivision (b) of section 266i. (Bradshaw, supra, 31 Cal.App.3d at pp. 424 fn. 5, 426 fn. 9.)
[6] Perhaps based on ideas of women's status as "innocent" as opposed to "experienced" or "virtuous" in contrast to "fallen." (See Patton, supra,63 Cal.App.3d at pp. 216-218 [§ 266i does not only apply to attempts to persuade "virtuous" women to enter the profession].) *Page 1436