## COMMONWEALTH vs. DIANA MATOS.

No. 09-P-1895.

Middlesex. November 1, 2010. - January 11, 2011.

Present: DUFFLY, KANTROWITZ, & MILKEY, JJ.

*Prostitution. Deriving Support from Prostitution. Delinquent Child. Statute,* Construction. *Practice, Criminal,* Instructions to jury, Harmless error. *Due Process of Law,* Elements of criminal offense. *Constitutional Law,* Harmless error. *Error, Harmless.*

Discussion of G. L. c. 272, § 4A, which clearly expresses the Legislature's intent to penalize a person for inducing a minor, who is not then so engaged, to engage in the commercial enterprise of prostitution by offering for hire his or her body for indiscriminate sexual activity. [582-587]

At the trial of indictments charging, inter alia, inducement of a minor to become a prostitute, the judge erred in instructing the jury that the Commonwealth need only provide proof beyond a reasonable doubt that the defendant or a joint venturer did induce the minor to engage in an act of prostitution, and that it was not necessary for the Commonwealth to prove beyond a reasonable doubt that the minor had never before engaged in prostitution, where the instruction removed from the jury the crucial element whether the minor was already engaging in prostitution at the time she was induced to do so by the defendant, alone or acting as a coventurer; further, the error was not harmless, where there was strong contrary evidence that the minor had already resumed prostitution, and no evidence that it was the defendant who had induced the minor to do so. [587-588]

At a criminal trial, the evidence was insufficient to establish that the defendant, alone or by aiding and assisting a codefendant, induced a minor to become a prostitute [588-589]; however, the evidence was sufficient to convict the defendant of deriving support from the earnings of the minor's prostitution [589-590], and of contributing to the delinquency of the minor [590-591].

INDICTMENTS found and returned in the Superior Court Department on December 14, 2006.

The cases were tried before *Diane M. Kottmyer,* J.

*David B. Hirsch* for the defendant.

*Melissa Weisgold Johnsen,* Assistant District Attorney, for the Commonwealth.

DUFFLY, J. At issue in this case is the meaning of the language in G. L. c. 272, § 4A, inserted by St. 1979, c. 676, which makes it a penalty to "induce[] a minor to become a prostitute." After a jury trial in the Superior Court, the defendant was convicted under the statute of "induc[ing] a minor to become a prostitute." The defendant also was convicted of deriving support from the earnings or proceeds of a prostitute, G. L. c. 272, § 7, and contributing to the delinquency of a minor, G. L. c. 119, § 63.[1] The defendant appeals.

The defendant contends that in order to be convicted of inducing a minor to become a prostitute, the Commonwealth was required to prove that the minor was not a prostitute at the time of the alleged offense, but was induced by the defendant to take up prostitution. The defendant asserts that there was insufficient evidence to support her conviction and argues that the judge erred when he instructed the jury that the Commonwealth only had to prove that the defendant "did induce the minor to engage in an act of prostitution" and that it was "not necessary for the Commonwealth to prove beyond a reasonable doubt that the individual had never before engaged in prostitution."

As to the conviction of violation of c. 272, § 4A, we agree with the defendant and reverse the conviction. The evidence as to the remaining convictions was sufficient to convict, and the additional claims of error do not require reversal.[2] We affirm the defendant's convictions of deriving support from the earnings or proceeds of a prostitute and of contributing to the delinquency of a minor.

1. *The evidence.* We summarize the evidence in the light most favorable to the Commonwealth. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). We reserve for later discussion of the issues certain facts the jury could have found on the basis of the evidence. In late September, 2006, State

[1]The defendant and a codefendant, Antwan Sampson, were tried jointly and convicted of all three offenses. Sampson's appeal is addressed in an unpublished memorandum and order issued pursuant to our rule 1:28. See *Commonwealth* v. *Sampson, post* 1119 (2011).

[2]The defendant's additional claims are that there was prosecutorial misconduct in (1) calling the victim for the purpose of improperly impeaching certain of her testimony and to present inadmissible information to the jury, and (2) engaging in improper questioning of the victim.

police Sergeant Pi Heseltine and Malden police Detective Robert DiSalvatore were engaged in an undercover "sting" operation directed to uncovering prostitution activities believed to be taking place at a hotel in Malden. Two adjacent rooms in the hotel had been equipped with surveillance equipment so that a surveillance team in place in one room could visually monitor and record the activity in the adjacent room. The camera did not record sound, but the surveillance team could hear sounds in the room through the monitor. Another surveillance camera was placed in a van parked in the hotel lot.

On the September evening in question, Sergeant Heseltine was in the surveillance room monitoring activity in the adjacent room. Detective DiSalvatore, who was undercover and would pretend to be a customer, remained in the room that was under surveillance. Heseltine provided DiSalvatore with $260 in twenty dollar bills and a printed copy of an advertisement that had appeared on the Internet site "Craigslist" on which a person identifying herself as "Paris" promoted a "two-girl special" and provided a telephone number.[3] At about 8:30 P.M. that evening, DiSalvatore called the number obtained from the Internet listing. The call was answered by a female who identified herself as "Paris" from the advertisement. The female was later identified as "B.C.," a homeless, drug-addicted teenager who had reached her sixteenth birthday earlier that summer.

B.C. had been living "on the streets" during the preceding week, having run away from a halfway or sober house because she did not want to get "clean."[4] She had arrived at the halfway house directly from a Department of Youth Services (DYS) locked facility. On that September night, she planned to get some money by engaging in prostitution, which she had been doing for "a while" and at that time was her only source of income. Potential customers called a number that was listed on a Craigslist advertisement; B.C. used several prepaid telephones during that time period.[5]

---

[3]The number was registered to a prepaid telephone; no subscriber information was available as to this telephone.

[4]B.C., who was called as a witness for the Commonwealth, testified pursuant to a grant of immunity.

[5]B.C. testified that she had also engaged in prostitution activities before she was committed to the DYS facility; she said she had a pimp at that time.

When the undercover detective asked the female if she would meet him at his hotel, she replied that it would cost him $250. DiSalvatore agreed; he told "Paris" where he was and asked that she meet him at the hotel as soon as possible. B.C. was on the street when she answered the detective's call. She hung up the telephone and proceeded directly to where the defendant was working. The defendant called her boyfriend, the codefendant, Antwan Sampson, who arrived about fifteen minutes later. B.C. and the defendant got into his vehicle. With the defendant in the front passenger seat, Sampson drove B.C. to Malden. During the ride, B.C. telephoned DiSalvatore to inform him she would be there in five minutes.

On arriving at the hotel, B.C. told the defendant and Sampson that she "was going to be a couple of minutes." The defendant responded that she would wait for her. On her way out of the car, B.C. gave her birth certificate and Social Security card to the defendant to hold. Because B.C. had outstanding warrants, she never brought her identification in with her; she was concerned that the warrants might be revealed if she were to be arrested and identified. B.C. left her cellular telephone in the car with the defendant, so that she could call the defendant from the hotel room to confirm everything was "okay."

B.C. then entered the hotel and knocked on the door to the room in which the undercover detective was waiting. DiSalvatore opened the door and asked the girl if she was "Paris." B.C. replied, "Yes," sat on the bed, and immediately asked to see the money. DiSalvatore handed her the $260 in cash that he had been given. B.C. counted the money and placed it on the table next to the bed. She then told the undercover detective that she needed to make a telephone call to tell her ride that she was "okay," and borrowed the detective's telephone to make the call. The number B.C. called was that of the cellular telephone she had left in the car with the defendant; this was the same number provided on the Craigslist advertisement that DiSalvatore had called earlier that evening to speak with "Paris." When the call placed by B.C. was answered, B.C. said that she was in the room and that she was "okay." The detective could hear what sounded like a female voice coming through the earpiece of the telephone.

After hanging up and handing the telephone back to DiSalva-

582       78 Mass. App. Ct. 578 (2011)

*Commonwealth v. Matos.*

tore, B.C. asked him what he wanted. The detective said he liked her "ass," and the girl replied that if he wanted her "ass" it would cost him another fifty dollars. Taking his own cash from his pocket, DiSalvatore handed twenty dollars to B.C., telling her it was all the money he had on him. The girl agreed to perform the requested sex act for the $280 she had been given. She then reached into a pocketbook she had brought with her into the room and produced a condom, which she placed on the bed. B.C. began to take off her clothes and, after removing her pants and shirt, sat on the bed in her underwear.

By prearrangement, Heseltine called DiSalvatore on the hotel telephone in order to permit the undercover detective to extricate himself from the situation prior to engaging in a sex act with a prostitute. DiSalvatore answered the call and, after hanging up, told B.C. that it was one of his friends who had called to warn him that his girlfriend was on the way to the hotel and that B.C. had to leave. B.C. responded that she could not give the money back because "he" would be looking for the money. DiSalvatore then asked B.C. to come back in an hour and she agreed. B.C. dressed, took the $280, and left the room, not planning to return. She returned a minute later, however, and asked to borrow the undercover detective's telephone so she could call for her ride. B.C. called the same number she had previously called and inquired of the person taking the call, "Where are you? When are you going to get here?" She ended the call and again left the hotel room.

Sampson and the defendant were waiting in front of the hotel in the same car in which they had dropped off B.C. minutes earlier. Once in the car, B.C. immediately handed to the defendant all the money she had obtained from the undercover detective.

A Malden police officer stopped the car within blocks of the hotel. It was registered to a person identified as the codefendant's mother. The defendant, Sampson, and B.C. were placed under arrest and transported to the Malden police station.

2. *Discussion.* a. *Construction of inducement statute.* The relevant portion of G. L. c. 272, § 4A, provides as follows: "Whoever induces a minor to become a prostitute, or who knowingly aids and assists in such inducement, shall be punished . . . ." The Commonwealth argues that this language must be

read to prohibit "conduct that induces a child to engage in an act of prostitution," regardless of whether the minor is currently engaged in prostitution. It finds support for this view not in the language itself, but in reliance on what the Commonwealth asserts is the Legislature's intended policy of protecting juveniles "from pimps who seek to prey on them," as manifested in the entire context of G. L. c. 272.

As the Commonwealth points out, c. 272 includes a number of provisions that punish those who victimize minors. For example, G. L. c. 272, § 4B, the "pandering" statute,[6] makes it a crime to derive support or maintenance "from the earnings or proceeds of prostitution committed by a minor," or to share in such earnings or proceeds.[7] See G. L. c. 272, § 2 (crime to "entice[] or take[] away a person from the house of his parent or guardian or elsewhere, for the purpose of prostitution or for the purpose of unlawful sexual intercourse"); G. L. c. 272, § 4 (crime to induce "any person under 18 years of age of chaste life to have unlawful sexual intercourse"); G. L. c. 272, § 35A (crime to commit "any unnatural and lascivious act with a child under the age of sixteen"); G. L. c. 272, § 53A(b) (crime to pay, agree to pay, or offer to pay "any person with the intent to engage in sexual conduct with a child under the age of [fourteen]," or to be paid "in return for aiding a person who intends to engage in sexual conduct with a child under the age of [fourteen]"). The Commonwealth further notes that punishment for sexual offenses that target minor victims is generally greater than for sexual offenses against adult victims, thus "providing additional safeguards against the victimization of minors," *Commonwealth* v. *Baker*, 17 Mass. App. Ct. 40, 42 (1983), and furthering a policy of treating criminal conduct involving the sexual exploitation of children as more serious than when the same conduct involves adults.[8]

---

[6]As we said in *Commonwealth* v. *Thetonia*, 27 Mass. App. Ct. 783, 784 (1989), "General Laws c. 272, § 7, . . . is meant to deal with the 'pimp or purveyor,' and makes the crime a felony." There we also noted the dictionary definition of "pimp" is "a procurer; pander." *Id.* at 786 n.4.

[7]The defendant was indicted not under this section but under a similar provision, G. L. c. 272, § 7, which makes it a crime to derive support from the earnings or proceeds of a prostitute, without regard to the age of the prostitute.

[8]Engaging in sexual conduct for a fee in violation of G. L. c. 272, § 53A, is punishable by one year in the house of correction. The punishment, if the

We agree that the Legislature has expressed a clear intent to protect children from sexual exploitation by adults, not only in c. 272 but also in legislative enactments appearing throughout the General Laws.[9] The defendant was not indicted under any of these statutes, and we are constrained to determine only whether the defendant's conduct violated the plain language of G. L. c. 272, § 4A.

The Commonwealth's policy-based argument requires that we ignore the phrase "to become a prostitute" and insert in place thereof the phrase "to engage in an act of prostitution." "We decline to adopt an interpretation that ignores words and phrases of the statute. '[E]very word in a statute should be given meaning,' and no word is considered superfluous." *Commonwealth* v. *Disler*, 451 Mass. 216, 227 (2008), motion to proceed in forma pauperis denied, 129 S. Ct. 480 (2009), quoting from *Matter of a Civil Investigative Demand Addressed to Yankee Milk, Inc.*, 372 Mass. 353, 358 (1977), and citing *Casa Loma, Inc.* v. *Alcoholic Bev. Control Commn.*, 377 Mass. 231, 234 (1979). We must consider the words of the statute employed by the Legislature to see if their meaning is clear. If the words could be said to be ambiguous, we would construe them applying the "rule of lenity" and resolve any ambiguities in the phrase in favor of the defendant. See *Commonwealth* v. *Constantino*, 443 Mass. 521, 525 (2005); *Disler, supra* at 228.

---

sexual conduct is with a child under the age of fourteen, is imprisonment in State prison for not more than ten years or in the house of correction for not more than two and one-half years. *Ibid.* See G. L. c. 272, § 35 (unnatural and lascivious acts), and compare G. L. c. 272, § 35A (unnatural and lascivious acts with child under sixteen).

[9]It is, for example, a crime to entice or induce a child under the age of sixteen to enter or remain in a vehicle or building with the intent that "another person" will engage in sexual conduct for a fee with the child, to commit statutory rape or an indecent assault and battery on a child, or to engage in an unnatural and lascivious act with a child. See G. L. c. 265, §§ 26C, 13B; G. L. c. 272, §§ 35A, 53, 53A; *Commonwealth* v. *Filopoulos*, 451 Mass. 234, 237 (2008); *Commonwealth* v. *Disler*, 451 Mass. 216, 222 (2008), motion to proceed in forma pauperis denied, 129 S. Ct. 480 (2009). Furthermore, the statutory basis for one of the defendant's convictions is to be found in G. L. c. 119, § 63 ("Any person who shall be found to have caused, induced, abetted, or encouraged or contributed toward the waywardness or delinquency of a child, or to have acted in any way tending to cause or induce such waywardness or delinquency, may be punished by a fine of not more than five hundred dollars or by imprisonment of not more than one year, or both").

The words "prostitution" and "prostitute" are defined by our decisional law and have turned on the "common understanding for the definition" of these terms. *Commonwealth* v. *Walter*, 388 Mass. 460, 463 (1983), citing *Commonwealth* v. *King*, 374 Mass. 5, 12 (1977). In *King*, a prostitute was defined as "one who permits common indiscriminate sexual activity for hire, in distinction from sexual activity confined exclusively to one person." *Id.* at 12. Prostitution was characterized as "commercialized sexual activity" that legislation seeks to suppress. *Id.* at 12 n.5.[10] See *Commonwealth* v. *Cook*, 12 Met. 93, 97 (1846) (defining prostitution as "common indiscriminate sexual intercourse, in distinction from sexual intercourse confined exclusively to one individual").

The Commonwealth is concerned that if the statute is interpreted according to its plain meaning, the word "prostitute" will be viewed as a status which is retained even if a person ceases to engage in the conduct of prostitution. Thus, the Commonwealth claims, unless punishment is for a single act of prostitution, it will be a defense that the minor has the status of a prostitute, even if he or she does not currently engage in acts of prostitution. We disagree. As discussed in *King, supra* at 15 n.9, the phrase " 'prostitutes . . . may be punished,' [prescribes] penalties for persons who commit acts of prostitution rather than for persons with the status of prostitute." See *Commonwealth* v. *Sefranka*, 382 Mass. 108, 113-114 (1980) (offense of prostitution "can be used to punish defined conduct only, and not to punish status"). Thus, the statute refers to conduct — acts of prostitution — and a person may cease to engage in such conduct.

We next consider the meaning of the words "to become" in the language at issue. G. L. c. 272, § 4A. In the absence of a statutory definition, "we give [the words] their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose. . . . We derive the words' usual and

---

[10]*King, supra*, construed the definition of prostitution in G. L. c. 272, § 53, as excluding "the conduct of persons who hire or seek to hire another to engage in sexual activity." *Id.* at 16. After *King* was decided, "the views expressed in the separate opinion in that case were given support by the 1983 statute, now found in c. 272, § 53A . . . . The broad form of § 53A provided the statutory criminalization of acts of the prostitute's customers which was thought to be absent in the *King* case." *Commonwealth* v. *An Unnamed Defendant*, 22 Mass. App. Ct. 230, 234-235 (1986).

accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." *Commonwealth* v. *Zubiel*, 456 Mass. 27, 32 (2010), quoting from *Commonwealth* v. *Zone Book, Inc.*, 372 Mass. 366, 369, (1977). Webster's New Universal Unabridged Dictionary 164 (1983) defines the verb "become" as follows: "to pass from one state to another; to enter into some state or condition, by a change from another state or condition, or by assuming or receiving new properties, additional matter, or a new character."

We think that the language of the statute is plain and unambiguous and that it clearly expresses the Legislature's intent to penalize a person for inducing a minor, who is not then so engaged, to engage in the commercial enterprise of prostitution by offering for hire his or her body for indiscriminate sexual activity.[11] We are hard pressed to locate in the wording of § 4A

---

[11]Our interpretation is consistent with that of several other jurisdictions interpreting substantially similar language. See, e.g., *People* v. *Slipson*, 154 Mich. App. 134, 139 (1986) ("While at some future point in time a person convicted of prostitution in the past may no longer be considered a prostitute so as to be able to be induced 'to become' a prostitute again for purposes of the pandering statute, five or six months is not long enough"); *People* v. *Morey*, 461 Mich. 325, 332-334 (1999) (statute making it a crime to induce "a female person to become a prostitute" penalizes those who induce females who have not already engaged in prostitution; word "becoming" as used in phrase " 'to become a prostitute' is distinguishable from performing an act of prostitution"); *State* v. *Johnson*, 632 S.W.2d 33, 34 (Mo. Ct. App. 1982) ("a woman who is already engaged in the practice of prostitution cannot 'become' a prostitute"). See also *Commonwealth* v. *Katz*, 138 Pa. Super. 50, 56 (1939) (cannot convict for inducing woman to become prostitute who already is one); *Commonwealth* v. *Stingel*, 156 Pa. Super. 359, 362 (1944) (one may be guilty of pandering "by the inducement or persuasion of untarnished females into the practice" of prostitution); *Commonwealth* v. *Charen*, 177 Pa. Super 522, 525-526 (1955) (error to instruct on pandering in general where defendant indicted only for "inducing a female person to become a prostitute").

In two jurisdictions, a contrary result was reached. In *State* v. *Caputo*, 202 Or. 456, 465 (1954), the court cited policy reasons, and in *Nation* v. *State*, 445 N.E.2d 565, 569-570 (Ind. 1983), drafters of the Indiana Code defined "to become a prostitute" as performing an act of sexual intercourse for money.

The intermediate appellate courts in California are divided on the issue. Compare *People* v. *Wagner*, 170 Cal. App. 4th 499, 511 (2009) (an individual already a prostitute cannot be induced to "become" one), with *People* v. *Cason*, 179 Cal. App. 4th 1419, 1433 (2009) (indictment for inducing to "become" is not precluded by prior acts of prostitution). The Supreme Court

any Legislative intent to make it a crime to induce a minor to engage in a single act of sex for a fee. The Legislature rationally could have decided that inducing a minor who is not currently a prostitute to become one warrants separate punishment.

This is confirmed by our observation that other enactments of the General Laws, discussed *supra*, make it a crime to entice or induce a minor to engage in sex for a fee. See, e.g., G. L. c. 265, § 26C (penalizing one who entices a child under sixteen to enter a "vehicle, dwelling, building, or other outdoor space" with the intent that another person will engage in sexual conduct for a fee with the child); G. L. c. 272, § 53A(*b*) (crime to be paid "in return for aiding a person who intends to engage in sexual conduct with a child under the age of [fourteen]"). These provisions require that the child induced or enticed to engage in sex for a fee must be under the age of sixteen. It is for the Legislature to decide whether a statute should be enacted that makes it a crime to induce a minor over the age of sixteen to engage in a single act of sex for a fee.

b. *Jury instructions on inducement charge.* Given what we have determined to be the Legislature's intent in enacting G. L. c. 272, § 4A, it was error for the judge to instruct the jury that the Commonwealth need only provide proof beyond a reasonable doubt "that the defendant or a joint venturer did induce the minor to engage in an act of prostitution" and that it was "not necessary for the Commonwealth to prove beyond a reasonable doubt that [B.C.] had never before engaged in prostitution."[12] The statute does not punish for inducing a minor to engage in a single act of sex for a fee, but for inducing a minor, not then engaged in prostitution, to engage in acts of prostitution. The judge should not have removed from the jury the crucial element, whether the minor was already engaging in prostitution — that is, whether B.C. was already selling her body for indiscriminate sexual activity — at the time that she was induced to

of California has retracted decisions addressing this issue and has accepted *Cason* for further appellate review. *People* v. *Cason*, 107 Cal. Rptr. 3d 720 (2010).

[12]Considered in isolation, the instruction that the Commonwealth need not prove the minor was "never" a prostitute was correct. But the judge went considerably further and relieved the Commonwealth of the burden of proving beyond a reasonable doubt that the minor was not already a prostitute at the time she was allegedly induced to "become" one.

do so by the defendant, alone or acting as a coventurer with Sampson.[13]

The defendant did not object to the instruction when it was made but did so before the jury retired to commence its deliberations. We thus review to determine whether the error was harmless. See *Commonwealth* v. *Redmond*, 53 Mass. App. Ct. 1, 7 (2001). The instruction omitted an element of the crime and thus constitutes an error of constitutional dimension; however, the error "is not among the very limited class of structural errors subject to automatic reversal, and upon proper objection would be subject to harmless error analysis." *Ibid.*, citing *Chapman* v. *California*, 386 U.S. 18, 24 (1967). *Neder* v. *United States*, 527 U.S. 1, 7-10 (1999).

Following a thorough examination of the record, we ask "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *Neder*, *supra* at 19. Here, there was strong contrary evidence, including B.C.'s own testimony, that she had already resumed prostitution during the week preceding the assignation with the undercover detective. Even if the jury did not credit B.C.'s testimony, there was no evidence that it was the defendant who induced her to resume prostitution.[14] We therefore conclude that the error was not harmless and reverse the judgment.

c. *Sufficiency of the evidence.* The defendant argues that all her convictions must be reversed because there was insufficient evidence to support them as matter of law. We consider the evidence favorable to the Commonwealth in order to determine

---

[13]Although the evidence in this case does not present the issue, it would be for a jury to decide whether a minor, who at a prior time had engaged in acts of prostitution, had abandoned prostitution but was induced by the defendant to take it up again. Cf. *People* v. *Slipson*, 154 Mich. App. at 139.

[14]The defendant argues for the first time on appeal that the meaning of the word "induce" in § 4A should employ the indicia of inducement used in connection with an entrapment defense. The issue has been waived, and we need not decide it. We note that in connection with crimes related to inducing a minor, "induce" appears to be used interchangeably with "entice," "lure," "persuade," "tempt," "incite," "solicit," "coax," or "invite." See G. L. c. 265, § 26C (including "induce" among other terms in defining "entice" for purposes of child enticement statute). Also, "induce[]" is used with "encourage[]," "contribute[]," and "tending to cause" in G. L. c. 119, § 63 (prohibiting inducing or abetting delinquency of a child). See our discussion of § 63, *infra*.

whether it was sufficient to permit the jury to infer the exist-
ence of the essential elements of the crimes charged beyond a
reasonable doubt. *Commonwealth* v. *Latimore,* 378 Mass. at
676-677.

i. The evidence was insufficient to establish that the defend-
ant, alone or by aiding and assisting Sampson, induced B.C. to
become a prostitute in violation of G. L. c. 272, § 4A. This is
because there was no evidence from which the jury could reason-
ably infer that B.C. had not already been engaged in acts of
prostitution on the date that the defendant accompanied her to
the hotel. There was also no evidence that it was the defendant
who, earlier in the week after B.C. ran away from the halfway
house, induced B.C. to resume prostitution activities. The con-
viction must be reversed, and judgment is to enter for the defend-
ant on this indictment.

ii. We reject the defendant's claim that the evidence was
insufficient to convict her of violating of G. L. c. 272, § 7,
which provides, in relevant part: "Whoever, knowing a person
to be a prostitute, shall live or derive support or maintenance, in
whole or in part, from the earnings or proceeds of his prostitu-
tion . . . or shall share in such earnings, proceeds or moneys,
shall be punished . . . ." There was ample evidence from which
a jury could reasonably infer that the defendant knew that B.C.
was meeting with someone at the Malden hotel for the purposes
of having sex for a fee. This evidence included Sampson's call-
ing out from his holding cell, after the defendant, B.C., and
Sampson had been arrested, "That's my money! My girl worked
hard for it!"[15] From the additional evidence, including the defend-
ant's telephoning Sampson, accompanying him to transport

---

[15]Because multiple persons were arrested, Sampson was placed in a holding
cell while the defendant and B.C. were booked. At the defendant's booking,
she listed as her telephone number the same number listed by Sampson;
police inventoried a pocketbook in the defendant's possession. DiSalvatore
testified that B.C. had a pocketbook with her from which she produced a con-
dom, and she is seen with a pocketbook in surveillance videotapes.

Police also discovered in Sampson's pocket a wad of cash totaling $562, of
which $260 were the same bills that DiSalvatore had been provided and had
given to B.C. In addition, police seized from Sampson birth certificates
belonging to B.C. and the defendant, B.C.'s Social Security card, and two cel-
lular telephones, one of which corresponded to the number DiSalvatore had
dialed earlier that evening.

B.C. to the hotel (during which time B.C. communicated with the detective on her cellular telephone), safeguarding B.C.'s birth certificate and Social Security card during the encounter, waiting to confirm B.C.'s safety during the planned sexual encounter, returning to pick her up from the assignation, and accepting from B.C. the entire proceeds from the encounter — all of which suggested arrangements familiar to the three participants — a jury could reasonably infer that the defendant knew that B.C. was a prostitute and derived support, at least in part, from her earnings.

The jury were not required to credit B.C.'s denials that she discussed with the defendant why she needed a ride to the hotel, or her testimony that she was not sharing the proceeds of her prostitution with anyone else. Indeed, given Sampson's calling out and B.C.'s statement to the detective (that she could not give the money back because "he" would be looking for the money), the jury could infer, as they apparently did, that the defendant, acting jointly with Sampson, was involved in the illicit enterprise and derived at least some of her support from it. The present case is distinguishable from *Commonwealth* v. *Thetonia*, 27 Mass. App. Ct. 783, 786 (1989), where we said that "the furnishing of transportation and waiting in exchange for occasional gas money and drugs by a friend (male or female) does not come within the prohibition of 'deriv[ing] support or maintenance in whole or in part from the earnings of [a person's] prostitution.' "

iii. We also conclude that the evidence was sufficient to support a finding that the defendant was guilty of contributing to the delinquency of a minor, in violation of G. L. c. 119, § 63. As concluded in *Commonwealth* v. *Garcia*, 48 Mass. App. Ct. 201, 203 (1999) (Kaplan, J.), "We interpret G. L. c. 119, § 63, to require for a conviction that the accused shall have acted knowingly in the subversion of the minor — shall have understood that her conduct was blameworthy in relation to the minor. Section 63 is indeed sweeping in its definition of the offense, . . . but the requirement of establishing the knowledge element inheres in each part of the definition, from 'caus[ing]' to 'act[ing] in any way tending to cause' delinquency." B.C. testified that she had "grown up with" the defendant and had known her for many years. From this and other evidence we

have recited, the jury reasonably could infer that the defendant knew B.C. to be a minor, and understood when she undertook actions to provide B.C. transport to and from the hotel, safeguarded her documents while B.C. went to the hotel room, and conferred with B.C. to assure her safe arrival, that B.C. would then engage in a sexual encounter in exchange for a fee. This was conduct that constituted action tending to cause delinquency.[16]

3. *Conclusion.* Based on the foregoing, we reverse the conviction of inducing a minor to become a prostitute and set aside the verdict; judgment is to enter for the defendant. The judgments on the defendant's convictions of deriving support from or sharing the earnings of a prostitute and of contributing to the delinquency of a minor are affirmed.

*So ordered.*

---

[16]We summarily dispose of the defendant's remaining claims of error. We disagree that the prosecutor engaged in misconduct when he called B.C. as a witness; her testimony provided "material assistance to the Commonwealth's case." *Commonwealth* v. *Melo*, 67 Mass. App. Ct. 71, 77 (2006). The prosecutor's questioning of B.C. regarding whether she had brought a yellow pocketbook into the hotel room was a proper effort to jog her memory, since she was viewed with the bag in a videotape admitted in evidence. The question did not assume a fact not in evidence. Compare *Commonwealth* v. *Lucien*, 440 Mass. 658, 663 (2004).